## Case No. 17,939.

### WOOD v. ALLEGHENY COUNTY.

[3 Wall. Jr. 267; [1] 20 Leg. Int. 228.]

Circuit Court, D. Pennsylvania. Nov. Session, 1859.

COUNTY BONDS PAYABLE TO BEARER— NEGOTIA-
BILITY.

1. Where a county is authorized by statute to issue bonds, but is subjected to certain restrictions in limitation of its power, and disregarding the limitations, issues them absolutely payable to bearer, and they pass into the hands of a bona fide holder for value, who has bought them in the market in the course of trade, the county is liable on them. The court will in such case not look behind the face of the bond, nor inquire whether the bonds have been issued with all the forms prescribed or not.

2. Ex. gr. the county of Allegheny was authorized by the legislature of Pennsylvania to issue bonds in aid of certain railroads—but it was prescribed that the subscription should be advised by the grand jury of the county; and until the railroad was completed the railroad company should pay the interest on them. The jury advised the subscription, providing that no sales should be made below par. The bonds were issued to the company, who, having procured an act of assembly to that effect, sold them greatly below par. Having passed into the hands of bona fide holders, who bought them in the course of trade, and being on their face payable to bearer, the county was *held* liable on them for the interest, the railroad having failed to pay it.

This was a suit brought to recover the interest due on several bonds of the county of Allegheny, which had been issued in aid of certain railway companies, and under authority or pretence of authority of statutes of Pennsylvania, giving the county power to take stock in them. The railways ran to other counties, and even into other states. The statutes, however, authorized the subscription, only after a previous recommendation had been made by the grand jury of the county in favor of it; and contained a provision that the railway companies, and not the county, should pay the interest on the bonds until the roads were completed. The grand jury had recommended the subscription, coupling their recommendation, however, with a proviso, as a condition of their recommendation, that the bond should not be sold below par. As soon as the recommendation had been obtained from the jury, the parties projecting the railways, or jobbers and brokers whom they employed, procured, by very irregular ways, an act of assembly authorizing a sale irrespective of price; and the bonds were bartered away by the same class of people, at enormous, not to say at fraudulent rates of discount; the county officers, who had supposed that the railway companies would always be able to pay both interest and principal and that the county was but lending its credit, having been grossly negligent of the interests entrusted to them, while the railway agents themselves were men of no higher charac-

ter than such as belongs to low politicians and swindlers. The acts of assembly requiring the railway companies to pay the interest till the roads were completed, were printed in full on the backs of the bonds. The bonds were all payable to bearer, and the coupons in the now common form of such things. The railway companies having neither completed their roads nor paid their interest, the county was now sued by bona fide holders of the coupons of bonds for value.

For the county it was argued—

I. The county, as a corporation, has no power to make any subscription of this kind; and the legislature cannot confer power on a body merely municipal, to exercise rights which belong only to its own competence.

II. But if this were not so, and if the county had power, the sale at anything less than par was illegal and void. The grand jury, which was a party to the contract of subscription, had stipulated that the bonds should be sold only at par. They meant that the money to be received by the railway companies should go pari passu with the increasing indebtedness of the county; and to prevent that exact thing which has occurred, st., a claim on the county for millions, while the money received by the railways has been less than thousands. The railway managers—receiving, doubtless, a large commission for the operation—"engineer" the matter through the grand jury room. They inveigle that body into a subscription, on the assurance that the bonds shall not be sold below par. Nor is this all: the grand jury themselves declare it to be a condition of their recommendation, that the bonds, if not thus sold, shall not issue at all. The managers of the railways then procure an act of assembly annulling the condition. The county, engaging in an enterprize of risk, had a right to say on what terms it would engage; and it did say. It said: "If you can get as much money as is represented on the face of our bonds, we believe that you can build your road, and that it will be profitable; but unless you put dollar for dollar into your road against the debt which we are incurring for it, we will not take your stock at all." This was a vital point every way; vital in point of law, and vital as respected the chance of the county's getting dividends from the stock subscribed for. For unless the managers could get money enough to complete the road, the enterprise was certain to leave the county a debtor, while it was equally certain to bring nothing to pay the debt. The success or failure of the road depended on adherence to the condition. The grand jury contracts for such adherence. Can the legislature, of its own power, annul the contract?

III. The statute made it obligatory on the companies to pay the interest on the bonds till the road was completed. This act be-

[1] [Reported by John William Wallace, Esq.]

ing printed on the back of the bonds, was notice to the person about to buy the bond, that the county assumed but a limited responsibility. Subscribing to railways is no regular or proper business of counties, even conceding it to be lawful under any circumstances. But for the statute authorizing it, the subscription would be confessedly void. That is now, an adjudged point in Pennsylvania. The statute which makes valid the subscription, validates it only quatenus et quodam modo. As soon as a person saw one of these bonds at all, he saw the qualified liability. It must be observed, that this was not an unusual sort of limitation of a well known and usual sort of contract. Municipal bonds payable to bearer, and in aid of railroads, had not theretofore been usual instruments in the United States. They were quite new. The thing, in its general nature, was special. Why may it not be considered so in its particular character as well? The whole subscription might or might not have been rendered nugatory by such a provision as was here notified to the person about to deal in the bonds; but there the provision was, and was plainly. There was nothing illegal in it, and being as legible as the contract, and on the same sheet, makes part and parcel with it.

GRIER, Circuit Justice. If the right of a municipal corporation to subscribe, even when authorized by the legislature, to purposes so alien to its general purpose as the construction of works of improvement which, in their largest part, are in distant counties and in other states, were open to me for consideration as a new point, I cannot say that I should hold such subscription other than simply void. The strongest arguments at law have been made against such subscriptions, and they are worth recurring to as containing true and lawyer-like views of the extent and character of municipal powers. But the matter is not open in this court. The legislature of Pennsylvania has authorized counties to make such subscriptions, and the supreme court of the state has decided (though by a bare majority) that the act is constitutional. The views of that court upon the statutes of their own state bind this court.

In spite, then, of all the resistance by the county to paying these bonds, here are the bonds, upon which the county "promises to pay." The county said to the railroad companies, "We want to help you: we have not the money, but we will lend you our credit: our promise to pay." That promise is, or should be, sacred. Doubtless many improper things have been done. The whole business of making cities and counties subscribe to railways was unwise. This will be admitted now; though the counsels of the able and conservative men who took ground against it was not heeded when given. Mer-

cantile and popular clamor demanded "subscription." Traders, politicians, and all kinds of interested jobbers urged and drove the matter, while commissioners, grand jurors and legislators have been led in the train. It is to be lamented that such things should be done; but they have been done. If the electors of our cities choose to hand over the great concerns of our public offices to ignorant and unprincipled administrators, they must suffer for it. They must themselves bear the burdens which they put it in the power of knaves to pile upon them. Whatsoever a man soweth, that he shall reap; and when he sows the wind, he is apt to reap the whirlwind.

The objections urged against the plaintiff's claim would have force, if the question were between the county and the railway companies. But it is not. It is between an innocent holder for value of a bond payable to bearer, and the party who sent it out into the market (or handed it over to others to do so) where it has been sold in the course of trade. It is useless to bring forward here, as against the business operations of this day, abstract dogmas out of Blackstone and the Institutes of Coke. Such instruments as these are were never dreamed of in their day. The laws of trade suggest and govern these matters. As I said in the beginning: "Here is the bond. Here is the fact." Your promise to pay is put upon the market. You gave it this negotiable and coupon form for the purpose of facilitating sale, and preventing all questions of equity about it. And now, when the promise has been put on the market, and sold to an innocent holder, you set up these equities. That won't do. Why did you issue your bonds, if you meant that the holder should look to the railways? Why did you not leave the railways to issue their own? For this reason only, that you knew that capitalists would trust you and would not trust them. I esteem the bold, and hardy, and industrious people of this county. I feel for them, with this load of debt put upon them by the careless and unworthy persons whom they have elected into office. But they have allowed the bonds to be issued and sold, and they must pay them.

Judgment for plaintiff.

NOTE. The county commissioners of Allegheny having still refused to pay the bonds, and refused obedience to a mandamus of the supreme court of Pennsylvania, to levy a tax for the said purpose, were all put into gaol, where they remained for many months. An arrangement was finally effected between the creditors and the county, by which the principal of the bonds was acknowledged, and a reduced rate of interest accepted.

―――

WOOD (ARGUELLES v.). See Case No. 520.

WOOD (BOUCICAULT v.). See Case No. 1,693.