Smith, et al. v. County of Clark.

MARSHAL N. SMITH, *et al.*, Defendants in Error, *vs.* THE COUNTY OF CLARK, Plaintiff in Error.

1. *Bonds, railroad—Coupons—Suit on, in U. S. Courts—Jurisdiction—Aggregate amount.*—In suit to recover coupons on railroad bonds issued by a County Court, the question, whether the amount sued on is sufficient to bring it within jurisdiction of the Circuit Court, is to be determined by the aggregate amount of the coupons.

2. *Railroad bonds—Coupons—Negotiability of.*—Railroad coupons are not rendered non-negotiable by the fact that they are not made payable to a particular person.

3. *Bonds—Railroad—County—Subscription—Popular election—Subscription, right of, a franchise—Repeal of special by general law—Bonds, recitals in—Innocent holder—Estoppel, etc.*—Section 14 of the North Mo. R. R. Charter of 1851 authorized counties along the line of the road to subscribe thereto, without the sanction of a popular vote. Section 10 of the act of 1857, creating the Alexandria & Bloomfield Railroad Company, (Sess. Acts 1856-7, p. 94,) made said section 14 a part of the latter charter. *Held,*

1st. that the right of subscription, conferred by section 14, was not exclusively that of the counties, but was a privilege of the railroads, and might be transferred, by section 10 aforesaid, to the A. & B. R. R. Co.

2nd. That bonds issued in 1865 by the County Court of Clark county, in aid of the A. & B. R. R. Co., under the authority conferred by the charter of 1857 were valid notwithstanding the inhibition of the act of March 23rd, 1861 (Sess. Acts 1861, p. 60, § 1.) The last named, being a general act, did not repeal the former and special one.

3rd. Although said bonds on their face recited, that they were issued under 'the general act for the formation of railroads, passed in 1855, and that act, as amended by the acts of 1860 and 1861, required a popular vote to authorize the issue of the bonds, such recitals would not estop an innocent holder from showing, that, in point of fact, the bonds were issued under the special act of 1857.

PER NAPTON, JUDGE.

4. *Bonds, county—Railroad—Bona fide holder—Popular vote—Recitals as to—Defenses.*—The act of 1855, and the amendments thereto, required a popular vote to authorize the issue of Clark county railroad bonds; and the bonds recited, that they were issued as authorized by the act. *Held,* that the holder would have a right to presume, that the acts had been complied with; and in suit on the bond, by a *bona fide* holder without actual notice of the facts, the defense, that no such popular vote had been taken, would be unavailing.

ON MOTION FOR REHEARING.—PER CURIAM.

*Held,* that the recitals of the bonds would not be conclusive upon the county as to the fact of the election.

5. *Bonds county—Railroad—Legal existence of Railroad—Issue as to, not to be raised collaterally—Quo Warranto, etc.*—In suit on a bond given by a County Court in aid of a subscription for a railroad, the question, whether the corporation had a legal existence, cannot be raised. The only proper way to test this question would be by *quo warranto* on the part of the State.

### Error to Lewis Circuit Court.

*Edward Higbee*, for Plaintiff in Error, contended, among other things, that the power vested in the County Courts to subscribe stock in the North Mo., and the Alexandria and Bloomfield Railroad, was not a franchise of the companies, and that the bonds issued in aid of such subscription were void, and cited Aspinwall vs. Davies County, 22 How., 364.

*Jas. Hagerman*, for Defendants in Error.

I. The Circuit Court had jurisdiction. There are seven counts in the petition. The aggregate amount sued for determines jurisdiction, and not the amount of each coupon. (Langham vs. Boggs, 1 Mo., 477; Barns vs. Holland, 3 Mo., 47; Martin vs. Chauvin, 7 Mo., 277; Judson vs. Macon County, Wes. Dist. Mo., April term, 1873, U. S. C. C.)

II. The coupons sued on are negotiable. They mention no payee, yet have the same legal effect as if expressly made payable to bearer. The bonds are payable to the company or bearer. The plaintiffs purchased the bonds and coupons at the same time. In Johnson vs. County of Stark, 24 Ill., the court holds a coupon, similar in every respect to those sued on, negotiable by delivery only. (McCoy vs. Washington county, Am. Law Reg., February, 1859; 21 How., 539; 2 Abbott, Nat. Dig., 44; Thompson vs. Lee county, 3 Wall., 332.)

III. The plaintiffs are innocent purchasers for value, before maturity, of the bonds and coupons in controversy. The only inquiry therefore, in this case is, "had the County Court of Clark county the power to issue them?" (Steines vs. Franklin county, 48 Mo., 167; State vs. Saline county, 48 Mo., 390.)

IV. The County Court of Clark county had the power to subscribe to the capital stock of the Alexandria and Bloomfield Railroad Company, and to issue bonds of the county, in payment of such subscription without first taking the sense of the voters. Section 14 of the charter of the North Missouri Railroad Company, adopted by the Alexandria and Bloomfield Railroad Company, authorized the County Court to subscribe to its capital stock without first taking a vote.

The general law of 1855, (1 R. C., p. 427, § 30,) and the amendments thereto in 1860, (Acts 1860, p. 88, § 1,) and in 1861, (Acts 1861, p. 60, § 1,) did not repeal these sections. Each of these statutes must be construed to operate prospectively, and not retrospectively. (State vs. Macon county, 41 Mo., 453; State vs. Sullivan county, 51 Mo., 522; State vs. Nodaway county, 47 Mo., 349; 48 Mo., 339.)

The irresistible conclusion, from the reasoning of the court in these cases, is, that the law of 1855, and the amendments of 1860 and 1861, did not repeal similar provisions in special charters.

V. "All the privileges, rights and immunities, of the North Missouri Railroad Company were undoubtedly conferred on the Alexandria and Bloomfield Railroad Company, as fully as if same had been re-enacted" in its charter. (Han. & St. Jo. R. R. Co. vs. Marion county, 36 Mo., 295; State vs. Sullivan county, ante; Binghampton Bridge Case, 3 Wall., 52.)

The record in this cause will warrant the statement, that the bonds in controversy were negotiated and purchased on the faith of that decision. Neither the people in their sovereign capacity, the Legislature, nor the judiciary, can alter this construction so as to effect rights acquired under it. (Gelpcke vs. City of Dubquue, 1 Wall., 175; 3 Wall., 303; State vs. Miller, 50 Mo., 129.)

The power to subscribe was given to the County Courts, but "the right" to receive the subscription attached to the company. Other corporations engaging in their enterprises were compelled to depend upon subscriptions of private individuals. They could have no other stockholders. This company was granted "the privilege," not enjoyed by others, of having these political subdivisions of the State, counties, become its stockholders. With section 14 the charter of the North Missouri Railroad Company was valuable from the day it was granted. Without that section it was valueless and would not have been accepted by its incorporators. The power of the counties to subscribe was a "right," "a privilege," and an "immunity." It was a part and parcel of the fran-

chise itself; and by section 10 of its charter the Alexandria and Bloomfield Railroad Company acquired it.

VI. If the County Court had the power to subscribe without an election, the recital on the face of the bonds, that they were issued pursuant to the general law of 1855, did not effect the power. The recital was unnecessary, and was wrong in fact, and should be treated as surplusage. (Crane vs. Lessee of Morris, 6 Pet., 598; Nodaway county case, *ante*).

VII. Under the law, as expounded by the Supreme Court of this State at the time these bonds were issued, they were valid in the hands of innocent purchasers, although the power of the County Court to issue them existed only under the general law then in force, which required an election. (Flagg vs. City of Palmyra, 33 Mo., 440; Han. & St. Jo. R. R. Co. vs. Marion county, 36 Mo., 294; Platte county case, 42. Mo., 171; Barret vs. Schuyler county, 44 Mo., 197; Steines vs. Franklin county, 48 Mo., 167.)

VIII. If the Legislature authorized the County Court to subscribe after an election, and the bonds were issued without an election, the innocent purchaser can recover. This is the settled doctrine of the Supreme Court of the United States. (Pendleton county vs. Amy, 13 Wall., 298; Commissioners Knox county vs. Aspinwall, 21 How., 539; Bissell vs. City of Jeffersonville, 24 How., 287; Moran vs. Commissioners of Miami county, 2 Black., 722; Meyer vs. Muscatine, 1 Wall., 384; Van Hortrup vs. Madison City, 1 Wall., 291; Supervisors vs. Schenck, 5 Wall., 772; Lexington vs. Butler, 14 Wall., 283; Grand Chute vs. Winegar, 15 Wall., 355.)

NAPTON, Judge, delivered the opinion of the court.

This suit was brought in August, 1867, on seven coupons, detached from bonds, dated January 1, 1865, due in twenty years, and payable to the Alexandria and Bloomfield Railroad Company or bearer. The bonds are in these words:

"$500. United States of America. No. 51. Alexandria and Bloomfield Railroad Company, county of Clark, State of Missouri; bond due in twenty years from date. Know all

men by these presents, that there is due from the county of Clark to the Alexandria and Bloomfield Railroad Company, or bearer, five hundred dollars, lawful money of the United States, with interest at the rate of seven per cent. per annum, payable annually on the first day of each year, at the treasury of said county of Clark, on the presentation and surrender of the annexed coupons; the principal to be due and payable twenty years after the date hereof; for the performance of all which the faith of the said county of Clark is irrevocably pledged, as also the property, revenue and resources of the said county of Clark. This bond being issued and pursuant to orders of the county court of Clark county, as authorized by an act of the legislature of the State of Missouri, entitled "An act to authorize the formation of railroad associations and regulate the same," approved December 13, 1855. In testimony whereof the said county of Clark has executed this bond by the presiding justice of the county court of Clark county, under the order of said court, signing his name hereto, and by the clerk of said court, under the order thereof, attesting the same and affixing the seal of said court. This done in the town of Waterloo, county of Clark aforesaid, this, the first day of January, 1865.

HARVEY SEYMOUR,
Presiding Justice of County Court of Clark County.
Attest: G. M. OCHILTREE,
Clerk of the County Court of Clark County."

Coupons are as follows:

"State of Missouri. Bond No. 51. $35. The county of Clark will pay thirty-five dollars on this coupon on the first day of January, 1867, at the treasury of said county.

G. M. OCHILTREE,
Clerk of the Clark County Court."

The petition states, that the coupons due in 1866 were paid, but that the coupons sued on, due in January, 1867, were not paid, although duly presented. There were separate counts on the seven coupons sued on. The answer denies that said bonds were issued in conformity to the law of De-

cember 13, 1855, asserts that no vote of the qualified voters of the county authorized the issue of the bonds for $50,000.

After a trial and a multiplicity of pleadings and a change of venue, the case was finally determined in the circuit court upon an agreed state of facts, which were substantially these :

1. That the A. & B. R. R. Co. was incorporated by the act of February 9, 1857, and subsequently, to-wit, on the 17th of September, 1864, duly and legally organized.

2. It is admitted that sections 8, 9, 10, 11, 14, and 19 of the act incorporating the N. M. R. R. Co. (approved March 13, 1851,) were on the 17th of September, 1864, specially adopted by said A. & B. R. R. Company.

3. That after the organization of said company, to-wit: On the —— day of —— 1864, the following entry was made on the books of said company : " We, the undersigned judges of Clark county, do subscribe $200,000 to the A. & B. R. R. Co., payable in county bonds, due in twenty years, at seven per cent. per annum, for said county of Clark, State of Missouri.

" Harvey Seymour, B. P. Hannan, Jacob Tinsman : Number of shares, $20,000 : amount, $200,000."

That said H. Seymour and B. P. Hannan signed the same at Luray in said county, and Tinsman at his residence during the vacation of the county court.

4. That afterwards, to-wit: On the —— day of ——, by an order of said county court, duly entered of record, the question, as to whether said county should subscribe 200,000 dollars to the capital stock of the A. & B. R. R. Co., was submitted to the resident qualified voters of said county, to be voted upon at the general election for State and county officers, held on the first Tuesday of November, 1864, at which said election a majority of the resident voters of said county voted not to subscribe said sum ; that afterwards, to-wit, on the 6th day of June, 1865, the said county court, by its order duly entered of record, having ordered the same, a special election was held for the purpose of voting upon the

question submitted to the resident voters of said county, as to whether said county would subscribe 100,000 dollars to the capital stock of said company, at which election a majority of the resident voters of said county voted not to subscribe said sum.

5. That afterwards, to-wit: On the 10th day of June, 1865, and at the dates subsequently as the same appear in the transcript from the records of said county court hereto attached marked "A" and made a part hereof, the said county court made the order, as in said transcript set forth; that on the said 10th day of June, and in pursuance of said order of that date, the county court issued and delivered to the A. & B. R. R. Co. one hundred $500 negotiable bonds with twenty interest coupons thereto attached to each of said bonds, of which exhibit "B," herewith filed, is admitted to be a copy, each coupon for the sum of $35; said bonds payable to said company or bearer, of which the bonds and coupons described in plaintiffs' petition and the coupons sued on were a part; that said bonds were dated January 1, 1865; that afterwards J. H. Crane, the duly authorized agent of said railroad company, before the maturity of said bonds and coupons sued on, for a valuable consideration sold, transferred and delivered the said bonds and coupons to plaintiffs, who were then partners, doing business under the firm name and style of Smith & Hall, who received said bonds and coupons in good faith, without actual notice of any defects in their issue, and upon the representations of said Crane, that said bonds and coupons were issued to said company in payment of subscription of said county of Clark to the capital stock of said company; that the bonds and coupons now belong to plaintiffs, and are due and unpaid.

6. It is admitted, that in pursuance of the order of the county court, authorizing him so to do, as the same appears in the exhibit hereto attached, marked ("A,"), G. M. Ochiltree was present at an election held by said railroad company for the election of its officers, on the first Monday of May, 1866, and as the agent of said county cast the vote of said

county, in which he represented and cast 500 votes for and on behalf of said county, which said votes represented $50,-000 stock of said company.

7. It is admitted that the first annual, and a large proportion of the second annual instalment, of coupons on the bonds described in plaintiffs' petition were paid by the said county on the presentation of said coupons at the county treasury; that the coupons sued on were presented to the county treasury on the 28th of March, 1867, and payment demanded, and payment was refused, as will be shown by reference to indorsements on the back of said coupons. The coupons sued upon were made part of this statement.

Signed by Hagerman, attorney for plaintiffs, and Lipscomb & Anderson, for defendant.

The order of the county court, referred to in the foregoing agreement, is as follows: " Whereas, heretofore, on the —— day of ——, 1864, the county court of Clark county entered into a certain obligation to and with the A. & B. R. R. Co. by signing the books of said company and subscribing $200,-000 to said company's stock, by which obligation the county became liable to a prosecution for the said sum of $200,000; therefore, it is ordered by the court, that the county of Clark issue the sum of $50,000 in seven per cent. bonds, payable twenty years from date, interest payable annually, which is to be received by said A. & B. R. R. Co. in full satisfaction for the adjustment of said former liability, said bonds to be placed in the hands of the county treasurer, to be by him paid out to said A. & B. R. R. Co., as other subscriptions are by the rules of said company required to be paid."

Section 14 of the North Missouri Railroad charter, which is incorporated in that of the A. & B. R. R., as authorized by section 10 of its charter, reads as follows:

" 14. It shall be lawful for the county court of any county, in which any part of the route of said railroad may be, to subscribe to the stock of said company," &c.

Section 10 of the A. & B. R. R. charter (Feb. 9, 1857,) is as follows:

"Said company shall in all things be subject to the same restrictions and entitled to all the privileges, rights and immunities, which were granted to the North Missouri Railroad Company by an act entitled 'an act to incorporate the North Missouri Railroad Company,' approved March 3, 1851, so far as the same are applicable to the company hereby created, as fully and completely as if the same were herein re-enacted."

Various declarations of law were asked, but the plaintiff had a judgment on the facts agreed.

A question is raised here whether the Circuit Court had jurisdiction, on the ground, that each count declared on a coupon for $35, which is a sum below the jurisdiction of the Circuit Court. The aggregate of the coupons sued on is admitted to be within that jurisdiction. In the United States courts the amount of $500 is essential to confer jurisdiction. The aggregate of the coupons sued on has been always impliedly or expressly assumed there as determining the question of jurisdiction. The point was expressly decided by Judge Dillon at the spring term of the Circuit Court in Jefferson City. We know of no decisions in our courts to the contrary.

Another point made is, that the coupons in this case, not being made payable to any particular person, are not negotiable. That point is decided in McCoy vs. Washington county, 1 Wal. Jr., 381.

It, is apparent from the agreed statement in this case, that the main and important question in it is, whether the court had the authority to issue the bonds in question under the act of 1857, which was the charter of the company, or whether the recitals in the bonds, that they were issued under the General Statutes of 1855, were obligatory, and therefore that the failure to call an election, which the recited act requires, vitiates the bonds.

The ground on which the Circuit Court decided the case was, that the charter of the company authorized a subscription without a vote, and we will examine that point first.

The charter of the A. & B. R. R. Co. was passed in 1857.

It was enacted, that the company should be entitled to all the privileges, rights and immunities, which were granted to the N. M. R. R. Co., as fully and completely as if the same were re-enacted in their charter.

The charter of the N. M. R. R. Co. contained a provision that the county courts of any county, in which any part of the road passed, might subscribe to the stock.

It is objected that the right of subscription granted to the counties on the line of the N. M. R. R. is not a privilege or immunity of the railroad company, but of the counties, and is therefore not transferred to the A. & B. R. R. Co. The section (14) conferring this power, as it appears from the agreed statement of facts, was expressly adopted by the A. & B. R. R. Co. It was undoubtedly the intention of the legislature to give to this last named company the same privileges that had been granted to the former. The county court had no power to subscribe to the stock of railroad corporations without a special authority from the legislature, either express or implied. The power thus conceded to the courts or other municipal bodies may well be termed a privilege to the corporations, and we see no substantial objection to a transfer of such a privilege by simply, in general terms, embodying the section of the original act, which granted it, into the new law. That such was the intention of the legislature, and of the railroad company, is clear, and if the word "privilege" admits of the narrow construction claimed, the practical construction it has received in this State, as may be seen by reference to the decisions of our courts, would preclude any inquiry into the subject now. These provisions were the principal means by which this and other roads were built, and without them the charters would have been of no value. (Hannibal and St. Jo. Railroad Co. vs. Marion county, 36 Mo., 294.)

The important question, however, remains: Whether this charter granted to the A. & B. R. R. Co. on February 9, 1857, or rather whether the section of it referred to, allowing subscriptions from county courts of counties along the line

of the road without a previous vote of the people, is not repealed by the subsequent acts of the Legislature passed in 1860 and 1861, and before the subscription made in this case.

The law in the revised code of 1855 concerning railroad corporations did not require any election. The thirtieth section reads: "It shall be lawful for the county court of any county, and the city council of any city, to subscribe to the capital stock of any railroad company duly organized under this or any other act in this State, and the county court or city council subscribing or proposing to subscribe to such capital stock, may, for information, cause an election to be held to ascertain the sense of the tax-payers of such county or city as to such subscription, and as to whether the same shall be paid by issue of county or city bonds, as the case may be, or by taxation."

The act of January 14, 1860, amendatory of this law, merely changes the words "may for information" into "shall for information."

That of March 23, 1861, which was also an act amendatory of this general statute in the revised code of 1855, requires an election to be held, and positively prohibits a subscription if the result of such an election shows a majority of the votes of the county against it.

It is not of any importance therefore to inquire, whether the act of 1855 would not of itself be regarded as an expression of the intention of the legislature to prohibit the county and city authorities from subscribing to railroad corporations, without ascertaining the wishes of at least a majority of the people within their respective municipalities, because the amendatory act of 1861 undoubtedly so declares; and this act, as well as that of 1860, was passed before the subscription now in question was made.

At the same time the charter of the A. & B. R. R. Co.— and we may add, without going outside of the history of various and repeated State adjudications and State legislation, the charters of a number of other railroad companies—allow-

ed the counties, cities, and towns to subscribe without any vote of the people. The question is, whether these provisions in the general law on the subject of railroad corporations repealed the specific provisions of the special acts chartering particular companies. In 1867 the Macon county case was decided (41 Mo., 453), and the subject was there discussed and decided.

It is true, that the act of 1861, though referred to by counsel, is not particularly noticed in the opinion of the court, but the act of 1865, which passed before the subscription made in that case, is fully considered as well as the prohibitory clause of the constitution of 1865. The act of 1865 was just as stringent as the act of 1861, so far as the necessity of a vote is concerned, and it was more so in regard to the number of voters essential to authorize the subscription. The subscription in that case was made in 1867, after the adoption of the new constitution, and after the passage of the act of the Legislature carrying into effect the constitutional provision.

In this case (the Macon county case) the case of Alexander vs. City of St. Louis, 23 Mo., 483, is particularly examined, and the opinion of the court in this last named case is re-affirmed, and the doctrine applied to the case under consideration. It was *held*, that a general prohibition is not inconsistent with a special indulgence, and that a special indulgence is not repealed by a general prohibition, though the latter is subsequent in time to the former. In the case of Alexander vs. St. Louis, the city was by its charter expressly prohibited from subscribing to the stock of any corporation, and a special act passed before the passage of the charter, allowing it to take a certain amount of stock in the Ohio and Mississippi Railroad Company, was held to be valid, and not affected by the general provision of the charter. In the Macon county case the same doctrine is asserted and the same subject—though not in regard to railroad incorporations—is discussed in Deters vs. Renick, 37 Mo., 597, in State vs. Probate Court, 38 Mo., 529, and in the City of St. Louis vs. Ind. Ins. Co., 47 Mo., 146, and a similar conclusion reached.

Moreover the Macon county case was followed by the Nodaway county case decided in 1871 (47 Mo., 349), and the Sullivan county case, decided by this court at the February term, 1873, (51 Mo., 522,) re-affirming the first decision.

So that the provisions of the Rev. Code of 1855, and the amendatory acts of 1860 and 1861, and the constitutional prohibition, and the legislative adoption of that prohibition immediately after its passage, have been held by repeated adjudications, and without any conflicting opinions of the court or any individual judge thereof, so far as the reports show, not to affect the repeal of the privilege contained in special charters.

That this was understood to be the law of this State appears also to have been recognized by the legislative department of the government, for in 1872 the Legislature passed an act entitled " an act to repeal certain sections of law granting to county courts and other corporate bodies the power to subscribe stock to railroad companies." This act was approved January 30, 1872, and specifically repeals certain designated sections in certain acts particularly specified, and including, among the twenty or thirty charters enumerated, the charter of the A. & B. Co. This was, or would have been, a mere act of supererogation, if it had been understood or supposed, that previous legislation on the subject had already effected this object.

Thus it will be seen that, up to January, 1872, the decisions of the Supreme Court had been acquiesced in, and no doubt acted on, by the railroad corporations and the municipal authorities of various counties, cities and towns, as the judicial history of the State abundantly shows. The necessary result was the investment of vast amounts of money in securities issued by counties, cities and towns, by virtue of the provisions in the charters of railroad companies. After the acts of 1855, 1860, 1861, 1865, the subject was regarded as *res adjudicata*, and upon this view millions of dollars have been invested.

Whatever, therefore, might be the opinion of this court or

of any individual judge, had the question come up for examination as an open one, we are all of opinion that it is now too late to disturb the received construction.

But it is objected in this case, that the bonds in controversy on their face purported to have been issued under the act of 1855, and that the holder is estopped from claiming that they were issued under the special act of 1857, which was the charter of the company.

Whether the recital in these bonds would constitute an estoppel against the makers, it is not important to inquire; if it were so, it would not follow that the purchaser or holder is bound. If he can show that the power existed, a false recital of it, however obligatory on the county or its agents, would not defeat its efficacy in the hands of a party nowise concerned in the perpetration of the falsehood. Crane vs. Lessee of Morris, (6 Pet., 598.)

Conceding, however, that the law is otherwise in regard to this recital, the question would still remain whether a recovery on such bonds could be defeated by proof on the part of the county that no election was held. This question was presented by instructions in the Circuit Court, and decided; and although it might be passed by in this case, yet as it is an important question, and arises in other cases now before the court, it may as well be considered here.

In the examination of this question, it is proper to inquire what determination, if any, has been reached by the Supreme Court of the United States on this point. The decisions of that court are not obligatory on this court in questions of this character, but it is certainly very desirable and of great importance to such of our own citizens as have invested in such securities, that they should not be depreciated below their value in the hands of citizens of other States or foreigners. The Federal courts having long since determined that these securities occupy the footing of commercial paper, do not consider themselves bound by the decisions of the courts of the State where they are issued, and have, in fact, utterly disregarded them in various instances, as the numerous cases in

the Supreme Court from Iowa and some from Michigan show.
The only effect therefore of contradictory decisions here, if
such should occur, would be to compel our citizens, who hold
such bonds, to sell them, perhaps at a ruinous discount, to
citizens of other States, who can sue in the Federal courts.

I do not propose reviewing the numerous cases in the Su-
preme Court of the United States on this subject. They run
over a considerable period, commencing perhaps with the case
of Knox County vs. Aspinwall (21 How., 539,) and term-
inating, so far as the published decisions go, in the case of
Grand Chute vs. Winegar (15 Wall., 355.) There may be
more recent cases, but I have not access to them.

In this case of Grand Chute vs. Winegar, the question came
up in a shape which renders the view of that court on it clear
and unmistakable. The point is presented by a plea and de-
murrer, and is therefore not liable to be misunderstood, or to
admit of conflicting constructions, as the generalisms or ab-
stract propositions stated in other cases seem to have been con-
sidered. The seventh plea was "that no special election,
such as the act prescribed, had been called or held, previous
to the issue of the bonds." The act under which the bonds
were issued, § 6, declared, "no bonds shall be issued by any
town in pursuance of this act unless a majority of the votes,
cast in said town at the election hereinfter mentioned, shall
be in favor of the same." Section 7 says "a special election
shall be called and held in each of the towns before named,
for the purpose of carrying this act into effect, within
six months after the passage of the act," and then pro-
ceeds to specify particularly the mode of conducting the elec-
tion. To this seventh plea, there was a demurrer, and the de-
murrer was sustained by the Circuit Court before which the
case was tried, and on appeal to the Supreme Court the judg-
ment was affirmed.

Mr. Justice Hunt, who delivered the opinion of the court,
refers to Knox County vs. Aspinwall, (21 How., 539,) Mercer
County vs. Hackett, (1 Wall. 83,) and Meyer vs. The City of
Muscatine, (1 Wall., 384,) and, quoting the language of Judge

Nelson in the first named case, says, that a *bona fide* holder for value of a bond, issued under an act of the Legislature, has a right to presume that *all* precedent requirements of the act conferring the power have been complied with. He says emphatically, that " the cases cited are in answer to the numerous offers to show want of compliance with the forms of law, or to show fraud in their own agents."

Now, in this case, " the form of law " not complied with was the total absence of any election at all, which the law required; and this fact was specially pleaded, and to this plea there was a demurrer, which, of course, admitted the fact. There is, therefore, no room for misconception, as there was in some of the other cases which decided the same thing in general terms. The plea was held bad, and the want of an election held to be no defense.

The court, however, go further, (I may say the court for no dissent of any of the judges appears in the report) and quote with approbation the head-note of the reporter in the Aspinwall case, and apply it to the case then under consideration. In the Aspinwall case there had been an election, but upon an insufficient notice; but the court in this Winegar case, where there was no election at all, apply the principle or doctrine as announced by Judge Nelson, and put at the head of the case by the reporter, " that where the bonds on their face import a compliance with the law under which they were issued the purchaser is not bound to look further for evidence of a compliance with the conditions of the grant of power."

Notwithstanding some fluctuations of opinion as to the extent to which the doctrine in the Aspinwall case went, we may assert with confidence, that, with the exception of the case of Marsh vs. Fulton County, all the cases since have conformed to the spirit and meaning of the Aspinwall decision. There were at first some dissenting judges who sought to establish different views, but recently it seems to be conceded, that the court has fully and finally settled on the doctrine of this leading case, and sustained the validity of municipal bonds in the hands of *bona fide* holders, wherever an authority to issue

them is conferred by law, although that authority may have been accompanied with conditions and limitations, which were disregarded by the municipal authorities. At times this presumption of a compliance with the law on the part of the agents designated by the Legislature seems to have been based on estoppels, such as recitals on the face of the bonds, the fact that the county or city had levied taxes to pay interest on them, or had received in exchange for the bonds certificates of stock from the railroad companies. This last was the only estoppel in the case of Pendleton vs. Amy, (13 Wall., 297.) But the court ultimately take the broad rule heretofore stated, and which is thus announced in the City of Lexington vs. Butler (14 Wall., 283), " that when a corporation has power under any circumstances to issue negotiable securities, the *bona fide* holder has a right to presume that they were issued under the circumstances which give the requisite authority, and are no more liable to be impeached in the hands of such a holder than any other commercial paper."

This being the result of the adjudication of the Supreme Court of the United States, let us see how the question stood here at the time the bonds in question were issued and purchased.

In 1863, the case of Flagg vs. the City of Palmyra was decided, (33 Mo., 440). In that case the return of the city officers set up as a defense, among other matters, that there was no election, though required by the act of the Legislature authorizing the subscription. Issue was taken on this plea, but the evidence on the trial is not reported or noticed in the opinion of the court, for the manifest reason, as it will appear from the opinion, that the court regarded the issue as immaterial; for the court say: " In this case, if the bonds have been issued by the city of Palmyra in apparent compliance with the law, and themselves gave no evidence of a want of performance of the pre-requisites to their issuance, and no actual notice of any such defect is traced to the bond-holder, we will not hold the bond-holder to be affected by a failure of the officers of the City of Palmyra to perform all that was re-

quired by law of them, in anticipation of and preparation for the issuing of these bonds. Being issued in apparent conformity to the law, the public (any of whom might acquire the bonds) is entitled to view them as issued in actual conformity to the law, and to suppose that all the acts required of the people and officers of the City of Palmyra had been duly performed."

" To apply these principles to the present case we hold the bond-holder to a knowledge of all that is contained in the act of the general assembly to incorporate the City of Palmyra and the amendatory acts above quoted; but in the absence of actual notice, do not hold them bound to inquire *whether an election had been held* as to the making of a subscription of stock in the Q. & P. R. R. Co., or as to the regularity of such an election, or the qualifications of the voters thereat, or whether the City of Palmyra had actually subscribed stock in the Q. & P. R. R. Co., or whether such subscription was made by the proper officer or officers of the city of Palmyra. The issuing of the bonds authorizes the receiver or purchaser thereof to suppose *that all those things,* if required by law, have been done in the time, form and substance required by law."

This language is plain, pointed and unambiguous, and substantially enunciates the doctrine of the Supreme Court of the U. S. in the cases to which we have referred.

This was the law of this State in 1863, and continued to be the law until the case of Steines vs. Franklin County, 48 Mo. 167, was decided, which was in 1871, eight years after the decision in Flagg vs. Palmyra. The bonds in controversy in the case now under consideration were issued in 1865, the interest coupons were paid in 1866 and partly in 1867, so that the law as declared by this court in the case of Flagg vs. Palmyra is the law which ought to govern the rights of the parties. (Gelpcke vs. City of Dubuque, 1 Wall., 175 ; Thompson vs. Lee County, 3 Wall., 327; Havemeyer vs. Iowa County, 3 Wall., 294.)

I have been unable to see the force of the distinction, which this court has recently made between the various pre-requisites imposed by law upon the action of municipal bodies, and

the grounds upon which a prominence is given to a mere election without regard to the substantial defects which may accompany it.

It would seem that an election without notice or upon insufficient notice, or one in which the requisite majority is not obtained, or at which disqualified votes are allowed, would be as worthless as no election at all. Of course mere formal defects occupy a different position, and may well be passed over, but it is conceded in all the cases, that every question as to regularity of the election and its result is closed against the municipal body that issues the bonds, and it is only essential to their validity in the hands of a *bona fide* holder that some sort of an election should be held. It may be that only a majority vote for the subscription when the law requires two-thirds; it may be that from the want of sufficient notice a mere fraction of the voters appear at the polls; it may be that hundreds of minors or other disqualified persons have voted; and in all these cases the pre-requisite of an election is as completely and essentially evaded as if no election had been held. Yet the officers of the municipality are allowed to decide upon these questions and their decision is held conclusive. Why not hold it equally conclusive when no election at all is pretended? It is said, that the power to subscribe is derived from the people of the county or city, and if this be conceded, a fraudulent or unfair and illegal election is as fatal to the exercise of the power as a subscription without any election at all.

But the power is derived from the law, without which the unanimous vote of every voter in the county or city could not confer it. The law gives the power, but restricts its exercise by requiring an election. The power is not derived from the people of the city, or the county, or township, but from the legislative branch of the State government. These municipal subdivisions are authorized to issue negotiable securities upon certain conditions, and one of the conditions is not complied with. All the conditions and restrictions and limitations are equally binding. The absence of one of the pre-

requisites is as fatal as another. The securities are negotiable, and go into the market as mercantile paper. Is the buyer bound to inquire whether the pre-requisites have been complied with? Or is he authorized to assume that these municipalities have done their duty as the bonds on their face certify?

As I understand the doctrine of agency, a negotiable instrument cannot be defeated by a plea that the agent who executed it exceeded his powers; provided he was authorized to execute such an instrument upon conditions which he failed to observe.

If a clerk or cashier signs paper as an agent to an amount exceeding that allowed by his principal, the holder can recover from the principal. Farmer's Bank vs. Butcher's Bank 16 N. Y., 125.

If a security on a negotiable instrument makes the principal his agent, and instructs him to deliver it only in case some other person signs it, and the agent delivers it without such additional signature, all the cases hold that the security cannot defend on the ground of want of authority. This is decided in a case at the present term.

The result of the decisions of the United States Supreme Court, and of this court at the time of the issuance of the bonds in controversy, is, that the holder had a right to presume that the act of 1855 and the amendments thereto had been complied with, and therefore the defense of no election was unavailing.

It will, of course be understood, that throughout this opinion all the questions examined are in regard to the rights of *bona fide* holders of municipal bonds, and are not intended to indicate any opinion upon questions arising on mandamus, or injunction, or other form of proceeding to arrest the action of municipal bodies or their officers. We have not referred to the decisions of this court on such questions, because very different considerations enter into such adjudications. Moreover the law inflicts heavy penalties upon municipal officers, who exceed or disregard their powers in subscribing to railroad companies, not only pecuniary but personal.

In conclusion, I venture to copy and adopt the opinion of Judge Greer in Wood vs. Allegheny County (3 Wall. Jr., 267), whose opinion, however bluntly and, perhaps, quaintly expressed, seems to me quite as applicable to the condition of affairs in Missouri as he supposed it to be in Pennsylvania:

"If the right of a municipal corporation to subscribe, even when authorized by the Legislature, to purposes so alien to its general purpose as the construction of works of improvement, which in their largest part are in distant counties and other States, were open to me for consideration as a new point, I cannot say that I should hold such subscription other than simply void. The strongest arguments at law have been made against such subscriptions, and they are worth recurring to as containing true and lawyer-like views of the extent and character of municipal powers. But the matter is not open in this court. The Legislature of Pennsylvania has authorized counties to make such subscriptions, and the Supreme Court of the State has decided, though by a bare majority, that the act is constitutional.

"In spite then of all resistance by the county to paying these bonds, here are the bonds, upon which the county promises to pay. The county said to the railroad companies: 'We want to help you; we have not the money, but we will lend you our credit, our promise to pay.' That promise is, or ought to be, sacred. Doubtless many improper things have been done. The whole business of making cities and counties to subscribe to railroads was unwise. This will be admitted now; though the counsels of the able and conservative men, who took ground against it, were not heeded when given. Mercantile and popular clamor demanded 'subscription;' traders, politicians and all kinds of interested jobbers urged and drove the matter, while commissioners, grand jurors and legislators have been led in the train. It is to be lamented that such things should be done, but they have been done. If the electors of our cities choose to hand over the great concerns of our public offices to ignorant and unprincipled administrators, they must suffer by it. They must themselves bear the bur-

Smith, et al. v. County of Clark.

dens, which they put it in the power of knaves to pile upon them. Whatsoever a man soweth that he shall reap, and when he sows the wind he is apt to reap the whirlwind.

"The objections urged against the plaintiff's claim would have force, if the question were between the county and the railway companies, but it is not. It is between an innocent holder for value of a bond payable to bearer, and the party who sent it out into the market or handed it over to others to do so, where it has been sold in the course of trade. It is useless to bring forward here, as against the business opera-ations of this day, abstract dogmas out of Blackstone or the Institutes of Coke. Such instruments as these were never dreamed of in their day. The laws of trade suggest and govern these matters. As I said in the begining, here is the bond; here is the fact. Your promise to pay is put upon the market. You gave it this negotiable and coupon form for the purpose of facilitating sale and preventing all questions of equity about it, and now, when the promise has been put upon the market and sold to an innocent holder, you set up these equities. That won't do. Why did you issue your bonds if you meant that the holder should look to the rail-ways? Why did you not leave the railways to issue their own? For this reason only, that you knew that capitalists would trust *you* and would not trust them. I esteem the bold, hardy and industrious people of this county, I feel for them with this load of debt put upon them by the careless and unworthy persons whom they have elected to office. But they have allowed the bonds to be issued and sold, and they *must* pay for them."

The judgment of the Circuit Court is affirmed, with the concurrence of all the Judges, except Judge Sherwood, who is absent.

ADAMS, Judge, delivered the opinion of the court on the motion for a rehearing.

This motion was not filed within the time prescribed by the rule of this court, requiring such motions to be filed within ten days after the opinion of the court shall have been delivered.

But as it is a very important case, and as there seems to be some misunderstanding in regard to the precise points passed upon by the court, we have considered the motion, and, in overruling it, I deem it proper to state briefly what was concurred in by us.

1. We assented to the proposition that the charter of the Railroad Company, which was enacted in February, 1857, allowed counties to subscribe to the stock of the Company, without taking a vote of the people. In regard to this matter the charter is plain and positive.

2. The next point was, whether this provision of the charter had been repealed by any subsequent legislation, or by the new constitution of 1865. This point we considered settled by repeated decisions of this court, to the effect that no subsequent act of the Legislature or the constitution had repealed that provision in the charter.

On the faith of these decisions large amounts had been invested, and we considered, that the question had been put at rest, and had become a rule of property which we had no right to disturb. This decision only applies to such charters as were granted prior to the constitution of 1865. There is nothing in the opinion which will warrant the conclusion, that we considered that part of the charter, allowing such subscriptions, a franchise which could not be repealed, either before or after the adoption of the new constitution.

3. It was not necessary to decide, that the recitals in the bonds, issued by the County Court to the Railroad Company, were conclusive, or amounted to an estoppel.

In my judgment, and in the judgment of a majority of the court, they do not amount to an estoppel. Although that is the settled doctrine of the Supreme Court of the United States, it has not been sanctioned here so as to make it a rule of decision in this State. These bonds were issued after the opinion of this court in Flagg vs. City of Palmyra, and before the Franklin county cases.

In delivering opinions, the judge who delivers them is allowed to make his own arguments and illustrations, without

compromising the other judges. It is unnecessary to say, that the illustrations indulged in by the learned judge, who delivered the opinion under review, were his own, and it was not necessary for the other judges to sanction them in order to concur in the result.

The only new point in this motion, not passed on by the court, is, that the charter of the company had ceased before the company was organized. Whether the corporation had a legal existence or not when the subscription was made, is a question that cannot be raised in a collateral proceeding.

It did exist as a matter of fact, and was in the exercise of all its chartered franchises, when the subscription was made and the bonds issued.

The only proper way to test this matter, is by a direct proceeding by the sovereign power of the State. It is a question between the State and the company, and a proceeding by way of *quo warranto* is the proper remedy. (State Bank vs. Merchants' Bank of Baltimore, 10 Mo., 124.)

The motion for a rehearing is overruled. Judge Napton filing a separate opinion. The other Judges concur.

Separate opinion by Judge NAPTON on the motion for a rehearing.

In the opinion overruling the motion for a rehearing, I concur.

In the opinion of the court heretofore filed, I discussed no question which was not raised by the record.

The points were two : First—Whether the laws passed since 1857—the date of the charter in question—repealed the privilege granted in that charter of taking subscriptions from counties without a vote ; and upon this point the court was agreed, that they did not, on the authority of various decisions referred to. The next point was, whether, if the bonds were conceded to have been issued under the law of 1855, as on their face they purported to have been, the absence of an election defeated a recovery on them ; and upon this point, I referred to the decisions of the Supreme Court of the United States, and to the decisions of this court anterior to, and long

after, the issue of the bonds in controversy, and showed, that both courts held such bonds valid in despite of the want of an election, and as such was recognized to be the law, both in this State, and by the Supreme Court of the United States, at the time of their issuance and purchase by the holders, the bonds could not be defeated by such a plea, although this court might have held differently since, and might entertain a different opinion now.

Upon both these points, I adhere to the opinion heretofore given.

There was, of course, no opinion given in regard to bonds issued under charters general or special, granted since the new constitution, for no such question arose, nor could any such question arise in regard to special charters, as the new constitution prohibited any such charters.