### In re COPENHAVER et al.

(Circuit Court, W. D. Missouri, W. D. March 2, 1893.)

1. FEDERAL COURTS—JURISDICTION—MANDAMUS TO COUNTY OFFICERS.
   Since the laws confer upon the federal courts jurisdiction of actions against a county by nonresidents of the state, but there is no provision for the issue of an execution upon such judgment against property of the constituent, such courts have jurisdiction ex necessitate to compel by mandamus the proper officers to make a levy to satisfy such judgment, as provided by the state laws for raising revenue to cover the county's liabilities. Riggs v. Johnson Co., 6 Wall. 166, followed.

2. SAME—CONTEMPT—HABEAS CORPUS.
   Disobedience of such writ is a contempt which the court may punish by imprisonment, and it is no ground for the release on habeas corpus of county judges so imprisoned that their continued detention might seriously interfere with the collection of the county revenues, and thereby endanger the continuance of the state government.

3. FEDERAL COURTS—FOLLOWING STATE DECISIONS—BONDS.
   The federal courts, in passing upon the validity of state or county bonds, will follow the constructions of state laws announced by the state courts at the time the bonds were issued, upon reliance on which they found a market, rather than a contrary construction, announced after such bonds are in circulation as commercial securities.

4. CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS—STATE BONDS.
   The rights of investors in state bonds become vested under the laws for raising revenue to pay principal and interest existing at the time the bonds are issued, and the obligation of the contract is impaired by subsequent laws which unduly restrict their rights to compel payment; hence the "Cotty Bill," (Laws Mo. 1879; Rev. St. Mo. 1889, §§ 7654, 7655,) making such changes in the laws providing for the payment of county bonds, is

unconstitutional. Seibert v. Lewis, 7 Sup. Ct. Rep. 1190, 122 U. S. 284, followed.

**5. SAME—PROSPECTIVE LAWS.**

The provision of Const. Mo. 1875, art. 10, § 11, limiting the power of certain county courts to make an assessment for county purposes in any one year in excess of 50 cents on the $100 valuation, has no application to county debts, contracted before the adoption of the constitution, for the section itself excepts from the restriction "taxes to pay valid indebtedness now existing." State v. Schooley, 84 Mo. 447, followed.

Petitions of B. R. F. Copenhaver and Thomas Nevitt for writ of habeas corpus. Denied.

John H. Lucas, for petitioners.
Geo. A. Neal, for the United States.

PHILIPS, District Judge. This is an application for discharge from imprisonment by the writ of habeas corpus. The petitioners are justices of the county court of St. Clair county. They are so imprisoned in the jail of this county on a contempt proceeding for refusal to obey the mandate of this court requiring them to make a levy, under the state law, to satisfy a judgment of this court against said county of long standing. While it greatly interrupts my attention to other pressing matters impatiently awaiting action by the court to stop to consider this case, in view of recent public agitation respecting the imprisonment of these petitioners, the cause of truth and justice well justify the day's attention I have given to it. The right of the citizen to have his cause heard without denial or delay, where his personal liberty is concerned, is paramount under our republican form of government. If their restraint be without "due process of law," they should be discharged. This application involves the authority of this court to imprison judges of the state county courts for refusal to obey the writ of mandamus. It is sufficient to say that this has now been the settled practice, established by decisions of the supreme court of the United States for over 30 years. It is a question which has called forth the best efforts of the ablest lawyers of the republic in its discussion, and on which has been expended a vast wealth of legal and judicial learning. It received its quietus in the cause celebre of Riggs v. Johnson Co., 6 Wall. 166. There was nothing political or revolutionary in the history of the establishment of this rule of practice in the federal courts. It was affirmed in a unanimous opinion by the supreme court, presided over by Chief Justice Taney, in 1860, in Knox Co. v. Aspinwall, 24 How. 376; and the final settlement of the question was an able opinion written by Mr. Justice Clifford, and concurred in by Mr. Justice Field, and others; Justice Miller dissenting with characteristic energy and ability. The doctrine sprang from the necessities of the case. As no law authorized the issue of an execution in the instance of a judgment in the United States court against a municipality, directly against the property of a constituent member of the corporation, the writ of mandamus was, ex necessitate, resorted to as the equivalent of an execution, to require the local agency of the state to make the levy as provided by the state statute for raising

revenue to cover liabilities of the municipal government; otherwise the federal judiciary would present the anomaly of being provided for in the organic law of the federal government, with unquestionable power and jurisdiction to proceed to judgment in an action by a non-resident citizen against the county or other municipal organization, and yet without power to execute judgment. As expressed tersely by the supreme court: "No court having proper jurisdiction and process to compel the satisfaction of its own judgments can be justified in turning its suitors over to another tribunal to obtain justice." In other words, it would seem to be a travesty of justice that, after conferring on the United States court jurisdiction to render judgment, (as congress had the unquestioned right to do,) the judgment suitor, as the opposers of the doctrine in question contended, should be turned out to pursue his remedy by another suit on his judgment in the state court. It is not necessary for me to say at this late day in the history of this matter what other remedy congress might have provided to mitigate any supposed evils of the practice in vogue, or what substitute might now be made with justice to both creditor and debtor. But it is proper to say that, unless congress shall wholly strip the courts of the United States of jurisdiction over controversies between citizens of different states whenever a municipality is concerned, it were madness to suppose it, or the federal courts, will ever deny the remedy by mandamus, until some other remedy, equally, if not more, efficacious, is provided.

It is insisted here, as elsewhere, that the federal courts of this jurisdiction, in attempting to enforce the collection of these county bonds, are disregarding and overriding the decisions of the state supreme court in construing the constitutions and statutes of the state. Sometimes a cure for a prevailing public distemper is found in a forgotten or neglected chapter in history, written or unwritten. I will take this occasion to recall one, connected with the county bond litigation in this state, which establishes the fact, however little it may suit the purpose of some people, that the responsibility for the judgments in this court against St. Clair county rests rather upon the rulings of the state supreme court than the federal courts. No state court had decided the subscription of St. Clair county invalid prior to the adjudication in the federal courts. Senator Vest and myself were the attorneys for the counties of Cass, Henry, and St. Clair throughout that litigation. The cases against Henry and St. Clair counties involved precisely the same questions, so that the litigation was conducted, by agreement, in the name of Henry Co. v. Nicolay, 95 U. S. 619.

Our first line of defense was that the bonds had been issued in 1870, after the adoption of the state constitution of 1865, and were in contravention of section 14, art. 11, thereof, which prohibited the county from issuing such bonds in aid of any railroad without the consent of two thirds of the qualified voters of the county, expressed at an election held therefor. We were at once confronted with decisions of our own supreme court, holding that this provision of the constitution was prospective, and had no retroactive operation, so as to subject to its interdiction a subscription made under a charter

granted by the legislature anterior to its adoption. The Macon County Case, 41 Mo. 453.

Our next contention was that this subscription in fact was not made under the provisions of the old charter of the Tebo & Neosho Railroad, as claimed, granted in 1859, but under the act of the legislature of March 21, 1868, (Laws Mo. 1868, p. 90,) which provided for building branch railroads; that, this statute having been enacted after the constitutional provision went into effect, no such subscription could be made without the consent of the required two thirds of the qualified voters of the county.

Again we were confronted with decisions of our state supreme court, affirming the validity of the act of 1868, and holding that a like subscription, made under like charter, supplemented by said act, was valid, notwithstanding no election was held. State v. Sullivan Co., 51 Mo. 522, and State v. Green Co., 54 Mo. 540. The first opinion was by Wagner, J., and concurred in by Adams, Ewing, and Sherwood, JJ., Napton, J., not then being on the court; the Green county decision, also by Wagner, J., being concurred in by Adams and Napton, JJ., Vories, J., dissenting, Sherwood, J., not sitting.

The next fortification we fell back behind was the act of 1861, (Laws Mo. 1861, p. 60,) which declared that "it shall not be lawful for the county court of any county to subscribe to the capital stock of any railroad company, unless the same has been voted for by a majority of the resident voters," etc. As this statute was enacted prior to the exercise of any right under the antecedent charter, and contained almost a penal prohibition, we believed it was an express legislative limitation ingrafted upon the exercise of the grant. When it was called to the attention of Judge Dillon on argument, it so staggered him that he announced that he would take the matter under advisement until the next term of court, in November, 1873. But in the interim the case of Smith v. Clark Co., 54 Mo. 58, was brought before the state supreme court, and when Judge Dillon went upon the bench at Jefferson City in November, 1873, the decision of the state court was handed to him, not only reaffirming the validity of the act of 1868, the exemption of anterior charters from the operation from said section of the state constitution of 1865, but entirely sweeping away from us the act of 1861, the last rock on which we planted ourselves with any reasonable hope of success. That opinion was written by so distinguished a jurist as Judge Napton, and was concurred in by Adams, Vories, and Wagner, JJ., Sherwood, J., absent.

Judge Dillon followed the rulings on these statutes and the state constitution by the state court, and we lost. When we reached the United States supreme court on appeal, the case of County of Scotland v. Thomas, 94 U. S. 682, from this circuit, had been passed on by the court, following the same rulings of the state supreme court; and when Hon. James O. Broadhead and myself entered upon the argument in the Nicolay Case we were informed at the outset that the questions involved had been decided against the county by our own supreme court. The Scotland County Case was reaffirmed, and we were left dead "in the last ditch." And it is worthy of observa-

tion in this connection that the doctrine of the inviolability of such bonds as commercial securities when in the hands of purchasers for value was as stoutly asserted by our supreme court as it has ever been maintained by the federal courts. See Flagg v. City of Palmyra, 33 Mo. 440; Smith v. Clark Co., 54 Mo. 71--74. So let the responsibility, if any is to attach by way of censure, for the deplorable condition of the taxpayers of St. Clair county, rest where absolute history places it.

It is true, after the state court had been accorded a locus poenitentiae, after the counties had lost in the federal supreme court by following the state court, and after the bonds in question had entered into circulation as commercial paper on the faith of its prior rulings, the light of a new revelation fell upon it, and it discovered the unconstitutionality of the said act of 1868 and the validity and virtue of the act of 1861. But the mischief done was then incurable. The supreme court of the United States refused to follow these later decisions of the state court on the well-established rule that the contract, as respects commercial paper, should be enforced according to the construction put upon the local statutes by the local court at the time the contract was made or the bonds went upon the market. The history of the federal adjudications utterly contradicts the contention of counsel that the federal courts had hitherto followed as a settled rule of practice the latest rulings of the state courts in the application of state statutes to commercial securities until the later bond litigation arose. The doctrine was established, and then on precedent, by so pronounced a state-rights jurist as Chief Justice Taney in Insurance Co. v. De Bolt, 16 How. 416--432, decided in 1853. It was not a municipal bond case, but arose on a state law of Ohio to tax banks, etc., and the question was whether the court should follow that ruling of the state court, made at the time the contract in question was made, or later decisions, overruling the former construction? Inter alia, he said contracts had been made with the state authorities under the first rulings of the state courts; "and upon a question as to the validity of such a contract, the court, upon the soundest principles of justice, is bound to adopt the construction it received from the state authorities at the time the contract was made. * * * Indeed," he further says, "the duty imposed upon this court to enforce contracts honestly and legally made would be vain and nugatory if we were bound to follow those changes in judicial decisions which the lapse of time and the changes in judicial officers will often produce; * * * and the sound and true rule is that, if the contract, when made, was valid by the laws of the state as then expounded by all the departments of its government and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent act of the legislature of the state or decision of its court, altering the construction of the law." So the court in Gelpcke v. City of Dubuque, 1 Wall. 206, says: "It is the law of this court. It rests upon the plainest principles of justice. To hold otherwise would be as unjust as to hold that rights acquired under a statute may be lost by its repeal. We shall never immolate truth, justice, and the law be-

cause a state tribunal has erected the altar and declared the sacrifice." And Judge Napton, in the Clark County Case, supra, asserted the same doctrine, and on page 70, after adverting to the fact, according to his construction, that our own courts and legislature had so construed the statutes in question up to a given time, and no doubt acted on by corporations, counties, and municipalities, observed: "The necessary result was the investment of vast amounts of money in securities issued by counties, cities, and towns by virtue of the provisions in the charters of railroad companies. After the acts, etc., the subject was regarded as res adjudicata, and upon this view millions of dollars have been invested. Whatever, therefore," he proceeds to say, "might be the opinion of this court or any individual judge, had the question come up for examination as an open one, we are all of the opinion that it is now too late to disturb the received construction." So, if the United States courts declined afterwards to follow the later tergiversations of the state court, it had for its authority the unanimous judgment of the state court. After these judgments were thus fastened immovably upon the taxpayers of the county, the taxpayers have been largely induced to resist settlement by compromise because of the fact that a Pegasus can be reduced to a "hobby horse," on which the local agitator hopes to ride into county office.

It is urged upon me that the attempt by this court to compel by mandamus these justices to make a levy is to bring them into direct conflict with the laws of the state, and would, if obeyed, subject them to punishment as for a misdemeanor. The statute thus interposed is what is commonly known as the "Cotty Bill," enacted in 1879, and incorporated in the statutes of 1889, (sections 7654, 7655,) of which enactment it is not too much to say that, had it conformed to the spirit of the state constitution, requiring the title to indicate the purpose of the act, it should have been entitled "An act to prevent the collection of judgments rendered in United States courts against any county or municipality in the state," for this, as is well known to every well-informed person familiar with the history of the county bond litigation, was its inspiration and object. This act undertook to change entirely the law in existence at the time the bonds were issued for raising the revenue necessary to meet the accruing interest thereon. The federal courts have never questioned the right of the state to prescribe its own method for raising a revenue, or the money for meeting such bond debts. They also recognize the right of the state to change the remedy therefor, provided only that in such change it make some suitable or adequate remedy, equally efficacious, so as not to destroy or impair the right. But this legislation sought to so obstruct the right as to render it impracticable of enforcement, by leaving it to the pleasure of the state courts. In effect, it subjects such judgments on contracts made anterior thereto to the supervision of the justices of the county court, as they are only required to act when satisfied that a necessity for such levy exists. Then they are to enter such finding of record, and certify to the county attorney to present the matter, at his own sweet will, and in his own time, to the circuit court, where the judgment of the

United States court must again run the gauntlet of revision of the circuit court judge. "Such circuit court, or the judge thereof, upon being satisfied of the necessity for such other tax or taxes, and that the assessment, levy, and collection thereof will not be in conflict with the constitution and laws of this state, shall make an order directed to the county court, commanding said court to have assessed, levied, and collected such other tax," etc.

The judgment of the United States court must receive, first, the approval of the county justices that a levy is necessary to satisfy the same. Then the circuit court is to pass upon the question as to whether such judgment conforms to its conception of constitutionality and lawfulness. If the opinion of the state courts be adverse, it is an end of the judgment of the United States court. This statute was sought to be applied to a judgment of the United States court at St. Louis, rendered on bonds issued for Cape Girardeau township, prior to the passage of the "Cotty Bill." The case went to the supreme court of the United States. Seibert v. Lewis, 122 U. S. 284, 7 Sup. Ct. Rep. 1190. In a unanimous opinion that court held this act to be in contravention of section 10, art. 1, of the federal constitution, which prohibits any state from passing any law "impairing the obligation of contracts." The opinion quotes the language of Chief Justice Taney in Bronson v. Kinzie, 1 How. 317:

"It is manifest that the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether, or may be seriously impaired by burdening the proceeding with new conditions and restrictions, so as to make the remedy hardly worth pursuing."

In Louisiana v. New Orleans, 102 U. S. 206, Mr. Justice Field says:

"The obligation of the contract, in the constitutional sense, is the means provided by law by which it can be enforced. Whatever legislation lessens the efficacy of these means impairs the obligation. If it tends to postpone or retard the enforcement of the contract, the obligation of the latter is to that extent weakened."

The court held, not that the levy in such case should be made despite any statute law of the state, but simply that it should be made under the law in force at the time the contract was made. The court say:

"When he seeks and obtains the writ of mandamus from the circuit court of the United States for the purpose of levying a tax for the payment of the judgment which it has rendered in his favor, he asks and obtains only the enforcement of the laws of Missouri under which his right became vested, and which are preserved for his benefit by the constitution of the United States. The question, therefore, is not whether a tax shall be levied in Missouri without the authority of its laws, but which of several of its laws are in force and govern the case."

No lawyer or statesman will question the right of the supreme court to construe the federal constitution, and determine when a state law impairs the obligation of a contract, or that its decision is conclusive, and becomes the supreme law of the land. So, when the county justices shall make a levy pursuant to the statute of the state in force at the time these bonds were issued, they will act in obedience to the supreme law of the land. And it is but due

to the state courts to say that they would respect the decision of the court of final resort, and decline to interfere with or to punish the county judges for obeying the paramount law. If, however, the courts should thus attempt to molest such officers for executing the mandate of the federal court, they would be protected by the supreme judicial power, under our form of government. It reaches the very depth of shallowness to imagine that any conflict of duty or obligation exists in the case of these petitioners. The excuse has no foundation in fact or law. What has just been said respecting the prohibition upon the state to "impair the obligation of contracts," applies to the next contention of petitioners, that the state constitution (article 10, § 11) limits the power of the county court of St. Clair county to make an assessment for county purposes in any one year to 50 cents on the $100 valuation; and the petitioners allege they have made this maximum assessment, and it has not produced more than sufficient revenue to defray the ordinary necessary expenses of county government. It is enough to say that the concluding clause of said section of the state constitution expressly excepts from the operation of said restriction the "taxes to pay valid indebtedness now existing." As this constitutional provision first appeared in the constitution of 1875, it has no application to the debt in question. This has been expressly so held by the state supreme court in State v. Schooley, 84 Mo. 447, which arose in St. Clair county, opinion by Judge Black, who was a conspicuous member of the convention which framed the constitution.

The court will furthermore say that where the amount of the judgment is so great as to make its payment unduly burdensome in any one year, its practice, where the county court is willing to comply, is to require only a moderate per cent. of the judgment to be imposed in any one year.

It is finally suggested by counsel for petitioners that the continued imprisonment of these judges might seriously interfere with the collection of the revenues of the county, and thereby endanger the continuance of the state government. With equal logic might it be contended that, if the county judges, for contempt committed against a state court, or for a violation of the criminal law of the state, be fined or lodged in a county jail awaiting trial, they should be unconditionally discharged by the state court, lest a session of the county court might not be held for the transaction of some important business. Any failure of administration of the county affairs by these judges is not the fault of this court, but of the county officers who will not obey the mandate of a court of competent jurisdiction, or of the people of the county who will not allow their county judges to perform their duty to this court, and of those who encourage them in their resistance to law.

A word as to the popular view of this controversy may serve to dispel some prejudice connected with this case. It is true no election was held in this county on the question as to whether the subscription should be made; but the truth is that the subscription was not made by the county court under cover, or in the dark. At that time a large and most respectable element of the

taxpayers of St. Clair county was under the ban of disfranchisement, and, as a more just method of reaching the sense of public opinion, petitions were circulated and signed by a very large number of taxpayers asking the court to make the subscription,—so large that it indicated a very strong popular feeling in the county in favor of it. In its isolation from railroad communication, the enterprising men of the county felt the necessity for and desired the building of a railroad into the county. In their zeal and enthusiasm sufficient safeguards were not thrown around the contract to protect the county against the contingency of a misapplication of the proceeds of the bonds; but the county court thereafter made levies and collected taxes to meet the interest on these bonds, and voted their subscription as stockholders in the road, and thereby invited public confidence in the integrity of her bonds. A large amount of work was done on the roadbed between Kansas City and Osceola, in St. Clair county. And while the corporation to whom the bonds were delivered did not complete the road, the roadbed thus constructed has since been turned over by the county to another railroad company, which has built the railroad without further cost to the county, and has long been operating the same into the county. And after the adverse decision of the supreme court of the United States in the Nicolay Case, as late as 1876 or 1877, the county judges proceeded with another levy, and the money they have thus collected from the people is held by the county authorities to-day. These facts are stated merely to show that the conduct of that court and the people of the county has given circulation and value to the bonds in question as commercial paper, and therefore a strong equity exists in favor of those who have since invested their money in these securities.

The county, instead of following the advice of their counsel, when their cause was last in court, to settle on the best terms attainable, has followed an evil genius, until the accumulated interest on the debt has swollen to fearful proportions. Every man of sense must recognize the fact that this debt cannot now be paid in full. It would be a disgrace to the state to repudiate it, and I believe it would be an insult to the intelligence and honor of the people of the county to suggest such attempt. The proper solution of the problem is an adjustment; and he who, with unselfish patriotism, controlled by a sense of justice, shall, on terms of equal equity to creditor and debtor, bring about such compromise, will enjoy, as he will most deserve, the lasting gratitude of the good people of St. Clair county.

As, in committing these petitioning judges to jail as for a contempt, I have followed the law and the practice of the courts, both federal and state, as I understand it, the petitioners are remanded.

I trust petitioners will prosecute an appeal to the higher court, and obtain on the questions involved a more authoritative ruling. No one would be more pleased to see them declared free, under the law, than myself.