## Case No. 15,503.

### UNITED STATES ex rel. DOUGLASS v. JUSTICES OF COUNTY COURT OF LINCOLN COUNTY.

[5 Dill. 184.] [1]

Circuit Court, E. D. Missouri. 1879.

RAILROAD AID BONDS—LEGISLATION OF MISSOURI —OBLIGATION OF CONTRACTS.

1. Judgment creditors of counties in Missouri are entitled to the levy of a special tax to pay judgments obtained on railroad aid bonds, if the county cannot or does not otherwise provide the means of payment.

2. The act of the general assembly of Missouri of March 8, 1879, known as the "Cottey Act," if applicable to such judgments, is, as to bonds issued prior thereto, in conflict with the provision of the constitution of the United States which prohibits the states from impairing the obligation of contracts.

On demurrer to the return of the respondents to the alternative writ of mandamus. The relator heretofore obtained in this court a judgment against the county of Lincoln upon coupons attached to bonds, of which the following is a copy:

"The County of Lincoln.

"No. ——— In the State of Missouri, $500.00.

"Hereby agrees to pay to the St. Louis and Keokuk Railroad Company, or bearer, the sum of five hundred dollars, in ten years from the 1st day of July, 1870, with interest at the rate of ten per cent per annum, payable semi-annually, on the 1st days of January and July in each year, at the National Bank of the State of Missouri, in St. Louis, Missouri, on presentation and surrender of the proper annexed coupon. This bond is issued under the authority of an act of the general assembly of the state of Missouri, entitled 'An act to incorporate the St. Louis and Keokuk Railroad Company,' approved February 16th, 1857, and in pursuance of an order of the county court of said county, dated August 13th, 1868, to subscribe three hundred thousand dollars to aid in the construction of the St. Louis and Keokuk Railroad, and in further accordance with an amendment to said order, dated June 21st, 1870. This bond shall be countersigned by the agent of said county before the delivery thereof. For the payment of this bond the faith and credit of Lincoln county is irrevocably pledged.

"In testimony whereof, the president of said county court has hereto subscribed his name, and the same is attested by the clerk of said court, and the seal of said court affixed hereto, this 21st day of June, 1870.

　　　　　　　　"Levi Bickel.

"Presiding Judge of Lincoln County Court, Missouri.

"Attest: F. O. Cake, Clerk."

The bonds were duly countersigned as required.

Upon this judgment, on due application

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

therefor by the judgment plaintiff, an alternative writ of mandamus issued, commanding, inter alia, the county court of Lincoln county, and the justices thereof, "to levy and cause to be collected a special tax upon all of the taxable property subject to taxation in said county of Lincoln, in an amount sufficient to pay and discharge such judgment, with interest and costs, or that they show cause," etc.

The respondents, the judges of the county court, make a return, in which, inter alia, they state that there was no law in force in the state of Missouri, at the date of the issue of the bonds upon which the relator's judgment is founded, authorizing the levy of any special taxes or the drawing of any warrant upon the common fund of the county for the purpose of paying such bonds, and that the collection of the relator's judgment can be enforced, if at all, in conformity to the provisions of the act of March 8, 1879, below mentioned. A return is also made to the effect that, under the revenue laws of Missouri in force from a date prior to the issue of the bonds on which the relator obtained judgment, the county courts have been and are limited to the levy of a tax for county purposes not exceeding one-half of one per cent upon the value of the property within the county subject to taxation, and that the proceeds of this tax are all needed for the ordinary and legitimate expenses of the county government. The relator demurs to the return.

The subscription to the stock of the said railroad company by the county was made August 13th, 1868, and the bonds of the county issued to pay the same are dated June 21st, 1870. The 29th section of the charter of the St. Louis and Keokuk Railroad Company, viz., the act of February 16, 1857, recited in the bonds of the county, is in these words: "Sec. 29. It shall be lawful for the county court of any county in which any part of the route of said railroad may be, to subscribe to the stock of said company; and it may invest its funds in the stock of said company, and issue the bonds of such county to raise funds to pay the stock thus subscribed, and to take proper steps to protect the interest and credit of the county. Such county court may appoint an agent to represent the county, vote for it, and receive its dividends." This charter contains no other provisions in respect of taxes or the mode of raising the means of paying bonds issued under the authority given by said section 29. But there was then (1857) in force in the state of Missouri general statutes in relation to the powers, rights, duties, etc., of railroad corporations. Rev. St. 1855, cc. 34, 39. These statutes, originally enacted in 1853, authorized the formation of corporations under general laws, and the legislature was also in the habit of granting special charters to railroad companies. The general statutes as to railroad corporations ap-

ply to companies organized under special charters, unless otherwise provided. Thus, section 57 of the railroad statutes of 1853, in relation to railroad companies, contained the provision that "all existing railroad corporations within this state, and such as now are or may hereafter be chartered, shall respectively have and possess all the powers and privileges contained in this act, and they shall be subject to all the duties, liabilities, and provisions, not inconsistent with the provisions of their charter, contained in this act."

The act of 1853 was substantially carried into the revision of the General Statutes of 1855 and 1865. Section 30 of said General Statutes of 1855 provides that the county court subscribing or proposing to subscribe to the capital stock of any railroad company duly organized under said law, or any other act, in this state, may, for information, cause an election to be held to ascertain the sense of the tax-payers of said county as to such subscriptions, and as to whether the same shall be paid by issues of county or city bonds, as the case may be, or by taxation. Rev. St. 1855, p. 427. Section 31 provides that, upon the making of such subscription by any county as provided for in previous section, such county shall become, like other subscribers to such stock, entitled to the privileges granted and subject to the liabilities imposed by this act or by the charter of the company in which such subscription shall be made, and may levy a special tax to pay the subscription or bonds. Id.

These provisions are substantially embodied in the revision of the statutes of 1865 (1 Wag. St. p. 305, §§ 17, 18), except that, conformably to the constitution of 1865, it was made necessary to have the sanction of two-thirds of the qualified voters to the proposition to aid railway companies, except (as construed by the supreme court of the state) in cases where special charters granted prior to 1865 gave the right to aid railways without such popular sanction. The provision as to levying taxes (1 Wag. St. p. 305, § 18) is: "That it shall be the duty of the county court making such subscription to issue their bonds or to levy a special tax, to be kept apart from other funds and appropriated to no other purpose than the payment of such subscription; but the total amount of tax levied for railroad purposes in any one year shall not exceed thirty per centum of the subscription made by the county." Section 34 (1 Wag. St. p. 319) gives "all existing railroad corporations within this state, and such as may be hereafter chartered or formed, all the powers and privileges contained in this chapter." By another section (1 Wag. St. p. 306, § 21), any county court which has heretofore—i. e., prior to 1865—subscribed to the capital stock of any railroad in this state, "shall have all the rights and powers to provide funds to pay such subscription as are granted to county courts by this chapter, and

may levy a special tax to pay the interest on their bonds, or to provide a sinking fund to pay the principal." The above provisions, quoted from Wagner's Statutes, were originally enacted in the general railroad act of 1853.

From an early date in Missouri the power of counties to levy taxes for county or general purposes has been limited, and was so limited in 1857, when the charter of the St. Louis and Keokuk Railroad Company was granted, and has been ever since. The constitution of Missouri of 1875, now in force (article 10, § 11), contains the same limitation of the rate of taxation in counties of the class of Lincoln, with this addition: "Said restrictions as to rates shall apply to taxes of every kind and description, whether general or special, except taxes to pay valid indebtedness now existing, or bonds which may be issued in renewal of said indebtedness."

Some further reference to the course of legislation, general and special, in respect of the power of counties to aid railways by the issue of bonds, is essential to a full understanding of the subject. The first statute in Missouri, says Norton, J., in State v. Macon Co. Ct. [68 Mo. 29], authorizing counties to subscribe for the stock of railways was in 1837, on the charter of the Louisiana and Columbia Railroad Company. Laws 1837, p. 247. The charter authorized the county courts to subscribe for stock without limit or condition of popular vote, and "to issue the notes of the county for such subscription;" but contained no provision as to the means of payment. Another railroad charter, passed in 1837, granted the rights, privileges, and immunities granted by the above charter. Laws 1837, pp. 234–247. And in other instances in 1837 the power to subscribe was given in the same language in respect of other railroads, and to issue notes, but no provision was made as to mode of payment. Laws 1837, p. 243, § 16; Id. p. 275, § 16.

In 1849 the Pacific Railroad was chartered. Laws 1849, p. 219. Section 14 of that charter was as follows: "Sec. 14. It shall be lawful for the county court of any county in which any part of the route of said railroad may be, to subscribe to the stock of said company, and it may invest its funds in the stock of said company and issue the bonds of such county to raise funds to pay the stock thus subscribed, and to take proper steps to protect the interests and credit of the county. Such county court may appoint an agent to represent the county, vote for it, and receive its dividends; any incorporated city, town, or incorporated company may subscribe to the stock of said railroad company, and appoint an agent to represent its interests, give its vote, and receive its dividends, and may take proper steps to guard and protect the interests of such city, town, or corporation." The same language occurs in the charter of the Missouri and Mississippi Railroad (section 13), granted March 8, 1849. Laws 1849, p. 376. At the same session (1849) another charter was granted with power to counties to subscribe and issue bonds, but containing no provision either as to protecting the credit of the county or as to levying taxes to pay the bonds. Laws 1849, p. 284, § 26. In 1851 numerous special charters were granted to railroad companies, copying the above-quoted section 14 of the Pacific Railroad charter. Laws 1851, p. 320, § 14; Id. p. 371, § 14; Id. p. 438, § 14; Id. p. 486, § 14. So in special charters granted in 1853. Laws 1853, p. 321, § 1; Id. p. 335, § 14; Id. p. 340, § 3; Id. p. 341, § 4; Id. p. 349, § 30; Id. p. 358, § 13; Id. p. 375, § 14. The charter of the Lexington and Boonville Railroad Company (Laws 1853, p. 366, § 13) has the same clause as the Pacific Railroad, with the addition of express authority to levy a special tax, and entitling tax-payers to a certificate of stock for each one hundred dollars of taxes paid. Similar provisions are in the charter of the Missouri Valley Railroad Company (Laws 1857, p. 100, § 20); in that of the Canton, etc., Railroad Company (Id. p. 106, § 20); in that of the La Grange, etc., Railroad Company (Id. p. 114, § 20); in that of the Grand River, etc., Railroad Company (Id. p. 118, § 20); in that of the Weston, etc., Railroad Company (Id. p. 142, § 20). Most of the special charters granted in 1855 contained the substance and generally the words of section 14, supra, of the Pacific Railroad charter. Laws 1855, p. 409, § 15; Id. p. 437, § 14. And there are various other like instances in the charters granted in 1855. It was exceptional where any reference was made to the levy of a tax. So in charters granted in 1857 (Laws 1857, p. 108, § 6); in the charter of the St. Louis and Keokuk Railroad Company, granted February 16, 1857 (Id. p. 132, § 29); and in other instances (Id. p. 155, § 14; Id. p. 166, § 15; Id. p. 170, § 11).

The legislation of the state shows that this course was continued down to the adoption of the constitution of 1865, which required the sanction of a two-thirds vote, but, as previously stated, the supreme court of the state has held that neither the general railroad law of 1853, embodied subsequently in the Revised Statutes of 1855 and of 1865, nor any other legislation, nor the constitution of 1865, affected the power given to counties in special charters to subscribe for stock and issue bonds, and the sanction of a popular vote was not required, unless it was so expressed in the particular special charter.

The act of March 8, 1879, commonly called the "Cottey Act," is as follows:

"Concerning the Assessment, Levy, and Collection of Taxes, and the Disbursement Thereof.

"Section 1. The following named taxes shall hereafter be assessed, levied, and collected in the several counties of this state,

and only in the manner and not to exceed the rates prescribed by the constitution and laws of this state, viz.: The state tax, and the tax necessary to pay the funded or bonded debt of the state, the tax for current county expenditures, and for schools.

"Sec. 2. No other tax for any purpose shall be assessed, levied, or collected, except under the following limitations and conditions, viz.: The prosecuting attorney or county attorney of any county, upon the request of the county court of such county (which request shall be of record with the proceedings of said court, and such court being first satisfied that there exists a necessity for the assessment, levy and collection of other taxes than those enumerated and specified in the preceding section), shall present a petition to the circuit court of his county, or to the judge thereof in vacation, setting forth the facts and specifying the reasons why such other tax or taxes should be assessed, levied, and collected; and such circuit court, or judge thereof, upon being satisfied of the necessity for such other tax or taxes, and that the assessment, levy, and collection thereof will not be in conflict with the constitution and laws of this state, shall make an order directed to the county court of such county, commanding such court to have assessed, levied, and collected such other tax or taxes, and shall enforce such order by mandamus or otherwise. Such order, when so granted, shall be a continuous order, and shall authorize the annual assessment, levy, and collection of such other tax or taxes for the purposes in the order mentioned and specified, and until such order be modified, set aside, or annulled by the circuit court, or judge thereof, granting the same: Provided, that no such order shall be modified, set aside, or annulled, unless it shall appear, to the satisfaction of such circuit court, or judge thereof, that the taxes so ordered to be assessed, levied, and collected are not authorized by the constitution and laws of this state, or unless it shall appear to said circuit court, or judge thereof, that the necessity for such other tax or taxes, or any part thereof, no longer exists. ·

"Sec. 3. Any county court, judge, or other county officer in this state, who shall assess, levy, or collect, or who shall attempt to assess, levy, or collect, or cause to be assessed, levied, or collected, any tax or taxes other than those specified and enumerated in section 1 of this act, without being ordered first so to do by the circuit court of the county, or the judge thereof, in the express manner provided and directed in section 2 of this act, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than $500, and, in addition to such punishment, his office shall become vacant; and the method herein provided for the assessment, levy, and collection of any tax or taxes not enumerated and specified in section 1 of this act shall be the only method known to the law whereby such tax or taxes

may be assessed or collected, or ordered to be assessed, levied, or collected.

"Sec. 4. The last preceding section shall be construed to extend and apply to the county court of any county, as well as to any judge thereof. and to extend and apply to the county board of equalization, and to any other body holding or exercising any county office or public trust in the county under the constitution and laws of this state.

"Sec. 5. Any county court, or judge thereof, or county treasurer, or county clerk, or other county officer, who shall order the payment of any money, draw any warrant, or pay over any money for any purpose other than the specific purpose for which the same was assessed, levied, or collected, or shall in any way or manner attempt so to do, shall be adjudged guilty of a misdemeanor, and, on conviction thereof, shall be punished as provided in section 3 of this act.

"Sec. 6. The right of appeal to the supreme court of this state, under any of the provisions of this act, is hereby preserved to any and all persons, officers, or parties in any wise affected thereby, as in other cases, and may be prosecuted as in other civil cases.

"Sec. 7. All acts and parts of acts inconsistent with this act, or in any manner whatever conflicting with· the provisions of this act, are hereby repealed.

"Sec. 8. The time fixed by law for the assessing and levying of state and county taxes, and for extending the same upon the tax-books in the several counties of this state, being within ninety days from the passage of this act. creates an emergency that demands the immediate enforcement thereof; therefore this act shall take effect and be in force from and after its passage."

Messrs. Overall, Henderson, Shields, Shippen, and others, for relator.

Messrs. Cunningham, Carr, and others, for respondents.

Before DILLON, Circuit Judge, and TREAT, District Judge.

DILLON, Circuit Judge. The act of March 8, 1879, in its application to township bonds issued under the act of March 23, 1868, which in terms authorized and required the levy of a special tax to pay the same, has been considered in the case of U. S. v. Johnson Co. [Case No. 15,489], note, in the Western district, in an elaborate opinion prepared by Krekel, J., in which Judge Treat and myself concurred—all of us having heard arguments upon the question there involved.

I do not propose to enter into any additional discussion as to scope of the provision contained in the constitution of the United States which prohibits the states from impairing the obligation of contracts. The doctrine of the supreme court of the United States on the subject is thus succinctly stated by Mr. Justice Swayne in a recent case: "The remedy subsisting in a state when and

where a contract is made and is to be performed is a part of its obligation, and any subsequent law of the state which so affects that remedy as substantially to lessen the value of the contract is forbidden by the constitution. and is, therefore, void." Edwards v. Kearzey. 96 U. S. 595.

No one denies this proposition, and it is not controverted by the learned counsel for the respondents. But, conceding it in all its breadth and force, they contend that it is not applicable to the relator's case. Their argument is this: When the bonds were issued. counties in Missouri could only levy for ordinary county purposes, upon the property within the county, a tax not exceeding one-half of one per cent in any one year; that this tax is levied to defray the ordinary expenses of county administration. in the category of which the payment of railroad bonds, or interest thereon, is not included; that there was no act of the legislature of Missouri, either general or special. applicable to the relator's bonds, in force when the bonds were issued. which authorized the county to levy a special tax to pay such bonds, or the interest thereon (in which respect the relator's bonds stand. it is claimed by the respondents. on a different footing from township bonds), and hence the relator has no contract right, so to phrase it, to the levy of a special tax for the payment of his bonds; that he is, therefore, only entitled to the payment of his judgment as a general debt against the county, out of the common county fund raised by the levy of one-half of one per cent for ordinary county expenses. The respondents state, in their return, that they "are satisfied that said common fund is not more than sufficient to meet the ordinary expenses of the county" for salaries, roads, bridges, the support of the poor and of the insane, the cost of jurors, etc. They do not return that they have any special fund out of which the relator's judgment can be paid. It is manifest, therefore, and not denied, if the relator is confined to getting his pay out of the residue of the county fund (raised by the levy of the limited rate authorized for this purpose), after defraying the ordinary and necessary current expenses of county administration, that his prospect of ever getting payment is remote and doubtful.

If the bond creditors of the county have any rights worth pursuing, they must rest upon an obligation of the county to levy an adequate tax to pay the bonds, if the county is unable to pay them in any other mode. This is the vital question in the case, and all that distinguishes it from the case in the Western district of Missouri before mentioned.

Has the relator, then, upon the facts shown in this case, a right to a levy of a tax specifically to pay his judgment obtained in this court upon coupons attached to the bonds of the county, issued. as before stated, in 1870. to the St. Louis and Keokuk Railroad Company, under the charter of that company, approved February 16, 1857? This question we proceed to examine.

Under the decisions of the United States supreme court next cited, the relator would be entitled to the levy of a special tax, if such a tax is necessary, to raise the means to pay his judgment, even if there was no statute in terms giving such a right, provided there were no statute provisions, general or special, regulating, expressly or by implication. such a right. Loan Co. v. Topeka, 20 Wall. [87 U. S.] 660, per Miller, J.; U. S. v. Macon Co: [99 U. S., 582], cited infra; U. S. v. New Orleans [98 U. S. 381], decided by the supreme court of the United States, March 31, 1879.

In this last case, one question was, whether, under an act authorizing a city to issue bonds, but containing no express provision for their payment by taxation, mandamus will lie to compel the city to levy a tax to pay a judgment obtained upon the bonds after their maturity.

The city set up as a defence that there was no legislative authority for the levy of such a tax. The petitioner demurred to this answer. but the circuit court overruled the demurrer and denied the writ, whereupon the petitioner took this appeal. The court below proceeded on the principle that the power of taxation belongs exclusively to the legislative branch of the government, and that the judiciary cannot direct a tax to be levied when none is authorized by the legislature. The supreme court, however, holds, in a careful opinion delivered by Justice Field, that, although the power of taxation is a legislative prerogative, it may be delegated to a municipal corporation, and that, when such a corporation is created, the power of taxation is vested in it as an essential attribute for all the purposes of its existence, unless its exercise is in express terms prohibited. When, therefore, authority to borrow money or incur an obligation to carry out any public object is conferred upon a municipal corporation. the power to levy a tax for its payment or the discharge of the obligation accompanies it, and this, too, without any special mention that such power is granted. It is always to be assumed, in the absence of clear restrictive provisions, that when the legislature grants to a city the power to create a debt, it intends that the city shall pay it, and that its payment shall not be left to its caprice or pleasure. Wherever a power to contract a debt is conferred. it must be held that a corresponding power of providing for its payment is also conferred. The latter is implied in the grant to the former. and such implication cannot be overcome except by express words of limitation. In the present case, the indebtedness of the city of New Orleans is conclusively established by the judgments recovered. Owing the debt, the city had the power to levy a tax for its payment. and it was clearly its duty so to do. The payment was not a matter resting

on its pleasure. but a duty to the creditor, and. having neglected that duty, a mandamus should have been issued to enforce its observance. The judgment of the lower court was therefore reversed, and the cause remanded, with directions to issue the writ in compliance with the petition.

Here the charter of the company (section 29) expressly authorized the county to subscribe for the stock of the company and to issue the bonds of the county to pay therefor, and to take proper steps to protect the credit of the county. This was special authority to create an extraordinary debt, without limitation of amount, by the issue of commercial obligations. which must be promptly met or the credit of the county be dishonored. The statute at the time, as to ordinary county expenses, provided that these must be met out of a fund raised by a levy limited to one-half of one per cent. An opinion of the supreme court of Missouri states that it was not contemplated that interest on railroad bonds should be paid out of the ordinary and current revenues of the county. State v. Macon Co. Ct., cited supra.

How. then. if this be true. was the debt, the large debt authorized to be created by bonds issued to aid railways, to be paid? It is not to be presumed for a moment that it was not intended to be paid at some time, and in some way. If bonds were issued, the only resource in general for their payment would be the levy of a tax for that purpose. It must be supposed that the legislature contemplated this when necessary. The bonds were to be issued "to raise funds to pay for the stock subscribed," says the charter. This could be done only by the sale of the bonds. Who would buy them if it had been declared, as is now contended to be the case by the respondents, that such bonds are not payable out of the ordinary county revenue, or, if so, the amount of this is so limited that, after paying current expenses, no residue for this purpose will ordinarily or ever remain, and that there is no authority to levy a special tax, or any tax whatever, for the purpose of paying them?

Under such circumstances. the doctrine of the supreme court of the United States, as declared in its judgment in the late case of U. S. v. New Orleans [supra]. would apply, if there was no express or special authority to levy a tax.

The charter itself. in authorizing the bonds to be issued by Lincoln county, empowered the county "to take proper steps to protect the credit of the county." The credit of the county can be protected only in one way. and that is by paying its obligations. If there is no other way to raise the means to do this, the power to levy a tax for this purpose. according to the doctrine of the supreme court of the United States. is implied. unless. in the general or special legislation of the state, there is something to repel the implication. If there were no other power to levy taxes to

pay the bonds. it is plain, under the late decision of the supreme court in the New Orleans case, that it must be deduced, if necessary to pay the bonds, from the power to take steps to protect the credit of the county. or might. if necessary, be deduced even from the power to issue the bonds.

The existence of such a power would seem to have been assumed or contemplated in the legislation of Missouri on this subject. Both prior and subsequent to the enactment of the general railroad law, in 1853, many special charters had been granted to railways, containing authority to counties along their line to subscribe for their stock, and issue bonds to pay therefor, without a vote of the people. All this time the general statutes prohibited counties from levying more than a very limited rate of taxation to pay their current expenses. These special charters, thus giving power to counties to issue their bonds in payment of stock in railways, as a rule, with but few exceptions, are silent as to the means of payment. There is, therefore, in general, no means whereby the bonds, or the interest thereon, can be paid, except by taxation—by taxes levied for that purpose.

In the late case of U. S. v. Macon Co. [supra]. Chief Justice Waite says: "In U. S. v. County of Clarke, 96 U. S. 211, we decided that bonds issued by counties under section 13 of the act to incorporate the Missouri and Mississippi Railroad Company were debts of the county, and that for any balance remaining due on account of principal or interest. after the application of the proceeds of the special tax authorized by that section, the holders were entitled to payment out of the general funds of the county. In Loan Co. v. Topeka, 20 Wall. [87 U. S.] 660, we also decided that 'it is to be inferred, when the legislature of a state authorizes a county or city to contract a debt by bond, it intends to authorize it to levy such taxes as are necessary to pay the debt, unless there is in the act itself. or in some general statute, a limitation upon the power of taxation which repels such an inference.' "

When the act to incorporate the Missouri and Mississippi Railroad Company was passed. the power of counties in the state to tax for general purposes was limited by law to one-half of one per cent on the taxable value of the property in the county. Rev. St. 1865, p. 96. § 7; Id. p. 121, § 76. This limit has never since been increased, and the constitution of 1875, which is now in force, provides that this tax shall never exceed that rate in counties of the class of Macon (article 10, § 11). If there had been nothing in the act to the contrary, it might, perhaps, have been fairly inferred that it was the intention of the legislature to grant full power to tax for the payment of the extraordinary debt authorized to an amount sufficient to meet both principal and interest at maturity. This implication is. however, repelled by the special provision for the tax of one-twentieth of one

per cent, and the case is thus brought directly within the maxim, "Expressio unius est exclusio alterius."

The limitation in the constitution of 1875 as to rate of taxation does not, however, apply to past indebtedness. When, therefore, these special charters provided, as they usually did, that the counties might issue bonds and take steps to protect the credit of the county, it was meant that this might be done by the levy of a tax for that purpose, if such a course was necessary to meet the interest and principal of the bonds. But it is contended by the relators that, aside from this view, there is express statute authority, and was when the bonds of Lincoln county were issued, and has been ever since the enactment of the general railroad law of 1853, to levy a special tax to pay such bonds and the interest thereon. This position is denied by the respondents.

It is necessary, in order to reach a correct decision of the question here presented, to examine the history of the railroad legislation of Missouri and the course of judicial decision in the state respecting it. In 1837, the authority was given for the first time to counties to aid in the construction of railways. It was not conferred by general law, but was contained in special charters to railways. Counties were authorized to issue "notes" for these subscriptions, but no means of payment were provided or pointed out. In 1849, the Pacific Railroad was specially chartered, and authority given to counties to subscribe without requiring a vote of the people, and issue bonds and protect the credit of the county; but no express power was given to levy taxes for that purpose The charter was silent as to taxes. In many special charters granted in 1849, 1851, 1853, 1855, 1857, and down to the constitution of 1865, this provision was in substance contained. In 1853, while the legislature was freely granting special charters to railroad companies, and authorizing the county courts to subscribe for stock therein, without a vote of the people, there was passed a general "act to authorize the formation of railroad companies." Laws 1853, p. 121.

The 29th section of that act is as follows: "It shall be lawful for the county court of any county, and the city council of any city, to subscribe to the capital stock of any railroad company duly organized under this or any other act in this state; and the county court or city council subscribing or proposing to subscribe to such capital stock may, for information, cause an election to be held to ascertain the sense of the tax-payers of such county or such city as to such subscription, and as to whether the same shall be paid by issues of county or city bonds, as the case may be, or by taxation." By the act of January 14, 1860, amendatory of this law, the legislature changed the words "may, for information," into "shall, for information." The act of March 23, 1861, amendatory of this act, requires an election to be held, and

prohibits a subscription, unless upon a majority vote. In 1868 the supreme court held that "may" meant "shall." Leavenworth & D. M. R. Co. v. Platte Co., 42 Mo. 171.

Construing all the legislation, the supreme court of Missouri, "by repeated decisions," held that where special charters contained authority to counties to subscribe without a vote of the people, this power was not repealed or affected either by the above act of January 14, 1860, or March 23, 1861, or the provisions of the constitution of 1865. This appears from the opinion of all of the judges in Smith v. Clark Co. (1873) 54 Mo. 58.

This was held, notwithstanding the 56th section of the general railroad act of 1853, which is in these words: "All existing railroad corporations within this state, and such as now are or may be hereafter chartered, shall respectively have and possess all the powers and privileges contained in this act; and they shall be subject to all the duties, liabilities, and provisions, not inconsistent with the provisions of their charter, contained in sections 9, 13–21, 23–40, 42–53 of this act."

This makes "all existing railroad corporations, and such as may be hereafter chartered," subject to the provisions of the general act in respect of subscriptions to railways, unless there is some provision in the special charter to the contrary.

The result was. according to the decisions of the supreme court of Missouri, that if a railroad corporation was organized under the general law of 1853, a popular vote was necessary to enable a county to subscribe for its stock; but if specially chartered, whether before or after the general law of 1853, with powers to counties to subscribe for stock, no popular vote was necessary, unless expressly required in the charter.

It is now contended by the respondents that if it was sound to hold that the general railroad act did not apply to powers contained in special charters giving authority to subscribe for stock, it results that the other provisions of the general railroad act, as to levying special taxes to pay such subscriptions, do not apply to subscriptions made under special charters. The force of this objection is felt. The course of reasoning of Norton, J., in the recent case of State v. Macon Co. Ct. [supra], is intended to demonstrate that holders of bonds issued under the power given by special charters are not entitled to payment out of the general or common fund of the county, because there is, he says, ample provision made for their payment out of a special fund raised by the levy of special taxes for this purpose. The learned judge in the case just cited, after reviewing the legislation of the state on the subject, says: "It thus appears that the fullest provisions have been made by the general assembly for the creation of a fund, distinct from the general expenditure or common fund of a county, out of which to pay

an indebtedness incurred by a county on account of a subscription to stock of a railroad company, or bonds issued in payment thereof, which fund is to be kept separate from all other funds, and to be applied to that identical purpose, and none other. These various provisions of the law have been referred to for the sole purpose of establishing the proposition that, for the payment of such obligations, resort could only be had to the special fund, and that it never was the intention of the legislature that the common fund, raised by taxation to defray the expenses of the county, could be made chargeable with their payment; but, on the contrary, that such latter fund was devised, provided, and intended to be charged with the payment of such ordinary expenses incurred in conducting the county government as has been hereinbefore indicated." State v. Macon Co. Ct., October term, 1878.

The relator in the present case seizes upon and urges this view in support of his claim that he is entitled to the levy of a special tax. On the other hand, the counsel for the county refers us to the language of the chief justice of the United States in the still later case of U. S. v. Macon Co. Ct., October, 1878. It is there said, arguendo: "Our attention has been directed to the general railroad law in force when the Missouri and Mississippi Railroad Company was incorporated, and when the bonds in question were issued, and it is insisted that ample power is to be found there for the levy of the required tax. The power of taxation there granted is, as we think, clearly confined to subscriptions authorized by that act, which require the assent of two-thirds of the qualified voters of the county."

The above observations of Norton, J., and of Waite, C. J., were made in a case where the special charter conferring the power to the county to subscribe contained an express provision as to the amount of special tax which might be levied to pay the bonds. Such a case is distinguishable from one where there is no such provision in the special charter as to taxes, and hence the observations of both of these learned judges should be limited to the special cases respectively before them. It is not necessary in this case for us to enter into the discussion. Our impression is, in view of the silence of the special charters (especially those granted prior to the general railroad law of 1853) on the subject of taxes, that the county courts were not prohibited from using the proceeds of the ordinary taxation to pay interest on debts incurred to aid railroads if the county court should find it necessary to do so, and if there was any available surplus on hand which could be used for such a purpose. The county court might, it would seem, "protect the credit of the county" in this way if they saw fit to do so. Interest due by a county would be a legitimate and current expense of the county. If this

is not so, then it results that the bonds authorized to be issued cannot be paid except by the levy of a special tax for that purpose; and authority to levy such a tax would be implied or deduced from the express power to protect the credit of the county. If Judge Norton is right, that railroad bonds, or interest thereon, cannot be paid out of the ordinary revenue of the county, then it results inevitably (unless a county has some special fund on hand) that such bonds, or the interest thereon, cannot be paid at all, unless there is power to levy a tax for that purpose. It would seem to us that on this point the view of the supreme court of the United States, that interest on railroad bonds may, in proper cases, be paid out of the ordinary fund of the county, is correct. We have no doubt that Judge Norton is right in asserting that there is ample provision for the levy of a special tax to pay railroad bonds. The observations of Chief Justice Waite, supra, above quoted, pertain to a particular class of bonds, and must be limited accordingly.

Inasmuch as the provisions of the general railroad law in respect of subscriptions and taxes are declared to apply not only to all railroad corporations then existing, but to such, also, as may be thereafter chartered; and inasmuch as the special charter of the St. Louis and Keokuk Railroad Company of February 16th, 1857, under which the bonds were issued by Lincoln county, contains the power to subscribe for its stock and to issue bonds, and also the power to protect the credit of the county; and inasmuch as there is nothing in this special charter or elsewhere inconsistent with the provisions of the general railroad law in respect of levying special taxes to pay for railroad subscriptions and bonds—our judgment is, those provisions have the same force and effect as if they had been contained in the charter of the company.

The correctness of this conclusion is placed beyond doubt by the practical construction of the legislation by the county courts, by the profession, and by this court. Down to this time special taxes have been levied by counties throughout the state to pay interest on railroad indebtedness, and the right to do this has never before been questioned, so far as the reported decisions show. The federal courts in this state, during the past six years, have issued many writs of mandamus, commanding the levy of special taxes of this character. Every objection which the zeal and the learned ingenuity of counsel representing communities burdened by oppressive debts could present against such writs has been presented, but never until now has this objection been urged. If particular words are alone regarded, and if the scope and purpose of the legislation are overlooked, this objection may find some support, but, after all, it has no real and solid basis.

By the laws in force when the bonds in question were issued, the taxes for their pay-

ment were to be levied by the county court, and the duty to levy the tax might, it was declared by statute, be enforced by mandamus. Rev. St. 1855, p. 429, § 35; Rev. St. 1865; 1 Wag. St. p. 306, § 20; Laws 1853, p. 137, § 34. The duty was a ministerial one, directly devolved by law upon the county court, and no limitations upon its exercise were prescribed. The county court not only had the power, but it was its duty, to levy the tax whenever it was necessary to protect the credit of the county by meeting its obligations.

Such remained the law until the act of March 8, 1879. It may be made a question whether that act was intended to apply to cases where a court of competent jurisdiction, state or federal, had issued a writ of mandamus commanding the levy of a tax to pay a judgment. If it was not intended to apply to such cases, it presents no obstacle to the justices of the county court in rendering obedience to the command of such a writ. If it was intended to apply to cases where such a writ of mandamus has issued from a court of competent jurisdiction, is it invalid as to bonds previously issued because it impairs the obligation of the contract by substantially lessening the value and efficiency of the remedy in force when the debt was created?

It is clear that it falls within the prohibition of the constitution of the United States. When the bonds were issued, the power of the county court was absolute and unconditional, and the duty simply ministerial, and capable of direct enforcement by a writ of mandamus to the justices of the county court. By the recent act the power is taken away from the county court, and it can only act upon the order of the circuit court or judge commanding it to levy such a tax. The recent act has undertaken to convert the duty of levying such taxes from a ministerial into a judicial duty. The creditor has no longer a direct, plain, and adequate remedy against the county court. If that act is valid as to the antecedent obligations, and applies to the judgments in this court, let us see its effect on the rights of the judgment creditor of a county. We must, instead of issuing, as we did previously, a mandamus to the county court directly, commanding it to levy a tax to pay the judgment, now issue a writ commanding the county court to enter an order, if it is satisfied that there exists a necessity for the levy of the tax, to request the county attorney to present a petition to the state circuit court or judge for authority to levy the same. Suppose that such a writ is permissible, and is complied with by the county court, and then suppose the prosecuting attorney, or circuit court, or judge, does not act. The judgment creditor of this court would then be without further remedy, unless the court should issue a writ of mandamus to the state circuit court or judge, commanding

action in the premises. The duty devolved by the enactment in question on the state court or judge is manifestly judicial. How could this court command the state court or judge to issue the order to the county court to levy the tax, since by the act that court, or the judge thereof, is to decide both upon the necessity for such a tax and "that the levy thereof is not in conflict with the constitution and laws of this state?" Suppose the state judge or court refuses to make the order, what is the judgment creditor in this court to do? We asked this question of one of the learned counsel for the respondents. He admitted that this court could not punish the state judge for disobedience, and that the only remedy of the relator was an appeal, under section 6 of the act, to the supreme court of the state. But suppose that court does not act, what, then, can the relator do? The learned counsel frankly answered, "Nothing; that such a case was not supposable." It is too plain for argument that legislation which compels this court to execute its judgments through the agency and by the assistance of the judicial courts of the state is not only impracticable, but, as respects bonds previously issued, is unconstitutional.

Unless the federal courts can execute their own judgments without the intervention, or even against the opposition, of the judicial courts of the state (if it were allowable even to suppose that such opposition would ever be offered), there would soon be none so poor as to do them reverence. Legislation which compels the relator to seek the fruits of his judgment in this court by a resort to the judicial powers of the state courts must be inoperative. As to the past it is inoperative, because it impairs the obligation of the contract by substantially impairing the remedy in force when the contract is made. The mutual independence, within their respective spheres, of the state and national judicial tribunals, is a fundamental doctrine in our systems of jurisprudence. Neither tribunal is dependent on the other. Each executes for itself and by itself its own judgments. The only control of the federal over the state courts is the appellate jurisdiction of the supreme court of the United States in the limited class of cases in which an alleged federal right has been denied by the judgment of the highest court of the state. Each court is alike the court of the people of the state. Neither is foreign to the other. Both are necessary parts of one complete, harmonious system. This court possesses no power or jurisdiction not conferred upon it by the supreme law in the land, viz., the constitution and laws of the United States passed in pursuance thereof.

The federal tribunals were created for wise and necessary purposes, and they cannot refuse to exercise the powers and jurisdiction with which they are clothed without a practical denial of the rights of suitors—rights

which have their origin and their guaranties in the constitution of the United States, and which are valueless unless they can be sustained and enforced by the judicial arm of the government. whenever or wherever or by whomsoever denied. When rights protected by the constitution of the United States are invaded by the legislation of congress or the states, the delicate duty—but still a duty—rests upon the judicial tribunals. which they cannot avoid if they would, so to declare and adjudge.

The present case is one which essentially depends upon the scope, effect, and application of the provision of the federal constitution prohibiting the states from impairing the obligation of contracts. It is a serious matter in any case to pronounce a statute unconstitutional, but where the validity of a statute depends upon whether it conflicts with the constitution of the United States, it is peculiarly a question to be decided by the federal tribunals, for any decision which may be made by the state courts in favor of the statute is subject to review and reversal by the supreme court of the United States. This consideration relieves us of much of the embarrassment which we would otherwise feel in pronouncing the act of the legislature. if intended to apply to such a case as this, to be unconstitutional, and the remaining embarrassment is greatly removed by the further consideration that if we are in error our judgment can be corrected by the supreme court of the United States.

The result is that the act of March 8, 1879, if intended to apply to judgments in this court, is wholly inoperative and void, under the constitution of the United States, as respects county bonds issued prior to its enactment.

Being of opinion that the relator is entitled to the levy of a special tax to pay his judgment, if there be no other funds of the county out of which it can be paid, the demurrer to the return to the alternative writ is sustained. and if the respondents have no further return to make. a peremptory writ will be ordered. Judgment accordingly.